In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1957

MBH Commodity Advisors, Inc. and
Jacob Bernstein,

Petitioners,

v.

Commodity Futures Trading Commission,

Respondent.

Appeal from an Order of the
Commodity Futures Trading Commission.
CFTC Docket No. CRAA 99-3.

Argued January 18, 2001--Decided May 7, 2001


   Before Cudahy, Kanne, and Rovner, Circuit
Judges.

   Cudahy, Circuit Judge.  The National
Futures Association (NFA) imposed
sanctions on Jacob Bernstein and MBH
Commodity Advisors, Inc. (MBH) in
connection with an infomercial and web
site on which both appeared. Following an
unsuccessful appeal to the NFA Appeals
Committee, Bernstein and MBH brought
their case to the Commodity Futures
Trading Commission (CFTC or Commission),
which summarily affirmed the NFA Appeals
Committee. Bernstein and MBH now appeal
to this court, arguing that the CFTC
applied a too-lenient standard of review
in evaluating the NFA Appeals Committee
decision; failed to make and declare
required findings; and applied expansive
readings of NFA rules in violation of
their due process rights. We affirm.

I.  BACKGROUND

   Bernstein has been active in the
commodities industry since 1972 and has
developed a "seasonal trading method."
This method is based on Bernstein's study
of the historical behavior of futures
markets--a study that allegedly revealed
that trades of certain futures products
will almost certainly produce a profit
when executed on specified dates. The

method is described in Bernstein's book, Key Date Seasonals--The Best of the Best in Seasonal Trades, as well as a series of newsletters, videotape lectures and other such materials, all of which he markets to the public.

A.  Facts

In the spring of 1995, Ramy El-Batrawi of Genesis/Positive Response Television (Genesis) approached Bernstein at a seminar in Burbank, California about the possibility of marketing Bernstein's futures trading products through the creation of an infomercial. On October 27, 1995, Bernstein, acting for himself and on behalf of MBH,[1] entered into a marketing and distribution agreement with Genesis. Bernstein testified before the NFA panel that, during the negotiations leading up to the final marketing agreement, he stressed the need for assurances that the infomercial would comply with NFA and CFTC regulations. Bernstein also stated that he insisted on the right to review the infomercial before it aired. However, the final agreement between Bernstein and Genesis granted Genesis the unrestricted and exclusive right to advertise and market Bernstein's commodity trading products. (Thus, Bernstein retained no right to pull the infomercial from the air, even if the infomercial raised regulatory concerns.) In exchange, Bernstein received four percent of Genesis' gross receipts from the sales of his products through the infomercial.

Prior to the infomercial's production, Genesis provided Bernstein with the infomercial script, which he reviewed. As part of his review, Bernstein independently verified the testimonials of three customers who were to appear in the infomercial as having successfully traded using his method. According to Bernstein, he satisfied himself that they had indeed profited from the use of his method although he did not continue to monitor their accounts to ensure that they remained profitable for the time during which the infomercial aired. For additional scrutiny, Bernstein sent an unspecified excerpt from the script to his attorney for review. Bernstein also requested that Genesis and Jeffrey Fox of Fox Investments, a broker to whom Bernstein referred customers for their

trades, send the infomercial's script to their attorneys. All three attorneys suggested changes to the infomercial, which Genesis made. Following these preliminaries, Bernstein approved the script. Genesis produced the infomercial, entitled Success and You, in the spring of 1996.

1.

The infomercial was ultimately aired by 390 television stations throughout the United States in 1996. The infomercial opens with a shot of two men who appear to represent contrasting degrees of wealth and poverty. A narrator states:

Both of these men have had the same opportunities throughout their lives. One struggles paycheck to paycheck trapped in a dead-end job, while the other has financial independence and the freedom to enjoy it. Why are some people stuck living a dull and meager existence while others succeed and lead the good life?

One of the host figures in the infomercial then appears on-screen and exclaims, "Today we'll reveal how you can change your humdrum existence into a life of financial independence on Success and You." Following some preliminary profiles, the infomercial focuses on Bernstein, who tells the audience, "I think trading futures is one of the best possible ways to achieve wealth in America today." Bernstein then recounts his own "rags to riches" story, concluding with a description of the seasonal trading methodology he developed along the way.

Bernstein next tells the viewer that his seasonal trades are "no-brainers," which require no guesswork because the trader is instructed when to enter and exit from the futures market. Bernstein notes that he has done all of the hard work for his customers, and emphasizes that his trades have been historically correct 70 percent of the time. (In fact, Bernstein claims that he doesn't even "fool around with anything that's been correct less than 70 percent of the time.") However, Bernstein also gives examples during the course of the infomercial of his more successful trades, naming, for example, a heating oil trade that he claims has an 87 percent probability of producing a profit.

Following the spotlight on Bernstein, the infomercial turns to three traders who testify to their success using Bernstein's seasonal method. Ken Whisenhunt, a truck driver, is shown telling his wife, "We're going to get that Lincoln now." Whisenhunt also tells the audience that "[i]t's fantastic when you make a trade and come up with several thousand dollars in your favor." Next, the audience is introduced to a Texas farmer named Harold Hinkle, who tells them, "I'm trading for one reason and one reason only, to make money. I'm trading Jake's methodology, because I believe in it, and it's working for me." Lastly, a housewife named Pam Smith is introduced. Near the end of the infomercial she declares, "Jake is so easy to follow in what he teaches you. . . . So, by keeping it simple, I've doubled my account and made a lot of money, and I feel like I'm on my way to making a lot more money." Following other segments, the infomercial concludes with a casino dealer who tells the viewer that "[m]ost people lose in a casino because their odds of winning are less than 50 percent. Imagine if your odds of winning were over 80 percent. If you were able to win on this table eight out of ten times, would you walk out a winner?"

The infomercial superimposes cautionary statements on six scattered occasions throughout its run. These statements are: (1) "There is a risk of loss in futures trading. Past results are not necessarily indicative of future results;" (2) "Statistical probabilities do not assure that any particular trade will be profitable;" and (3) "Persons who wish to commit money to the futures market should understand the risks before they do so."

2.

In addition to the infomercial, Genesis created an internet web site, entitled Amazing Discoveries, to promote Bernstein's materials. The web site's address is provided in the infomercial, and the site includes content similar to the infomercial. For example, the site states that "Jake Bernstein's Trade Your Way to Riches will give you the exact skills it takes to make money as a disciplined, successful commodities trader," and states that Bernstein's

trades are "no-brainer" trades with "unbelievable accuracy rates of 70, 80, even 90%." The web site only contains one small-print statement at the bottom of the web page warning of the risk inherent in futures trading: "There is a risk of loss in futures trading." The record does not indicate how many visitors viewed the web site.

3.

The infomercial and web site came to the attention of the NFA, which is charged with creating and implementing a comprehensive program for self-regulation of the commodity futures industry./2 To further this goal, the NFA is required to adopt rules governing the conduct of its membership. These rules are subject to Commission approval and must provide standards governing the sales practices of NFA members. See 7 U.S.C. sec. 21(p)(3); 17 C.F.R. sec. 170.5. In addition, these rules must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest, and to remove impediments to and perfect the mechanism of free and open futures trading." 7 U.S.C. sec. 21(b)(7).

Pursuant to its statutory mandate, the NFA has adopted numerous rules governing member conduct. See generally National Futures Association, NFA Manual (updated on an on-going basis). Because Bernstein and MBH were both members of the NFA at the time of the conduct relevant to this case, they were both subject to these rules, the most relevant of which is NFA Compliance Rule 2-29, entitled "Communications With the Public and Promotional Material." The following provisions of this rule are especially relevant:

(a) General Prohibition.  No Member or Associate shall make any communication with the public which:

(1) operates as a fraud or deceit;

* * *

(3) makes any statement that futures trading is appropriate for all persons.

(b) Content of Promotional Material.  No

Member or Associate shall use any
promotional material which:

(1) is likely to deceive the public;

(2) contains any material misstatement of
fact or which the Member or Associate
knows omits a fact if the omission makes
the promotional material misleading;

(3) mentions the possibility of profit
unless accompanied by an equally
prominent statement of the risk of loss;

* * *

(c) Hypothetical Results.

(1) Any Member or Associate who uses
promotional material which includes a
measurement or description of or makes
any reference to hypothetical performance
results which could have been achieved
had a particular trading system of the
Member or Associate been employed in the
past must include in the promotional
material the following disclaimer
prescribed by the NFA's Board of
Directors:

[lengthy disclaimer omitted]

NFA Compliance Rule 2-29.

  After reviewing the infomercial and web
site, the NFA determined that they misled
viewers and violated NFA Compliance Rule
2-29 for several reasons. The NFA
believed that the infomercial and web
site falsely implied that customers would
profit on the trades recommended by Bern
stein without adequately disclosing the
risk of loss. This violated Compliance
Rule 2-29(b)(3), which prohibits the use
of promotional material that mentions the
possibility of profit without featuring
an equally prominent warning of the risk
of loss. The NFA also concluded that the
infomercial falsely represented that
anyone could trade futures, in violation
of Compliance Rule 2-29(a)(3), which
prohibits any communication with the
public that contains any statement that
futures trading is appropriate for all
persons. In addition, the NFA charged
that the infomercial and web site
advertised hypothetical results without a
required disclaimer, in violation of
Compliance Rule 2-29(c)(1), which
requires promotional materials that make

use of hypothetical results to include a disclaimer stating the limitations of reliance on hypothetical results.

Following its review of the accounts of the three customers shown in the infomercial (Whisenhunt, Hinkle, and Smith), the NFA concluded that the infomercial falsely implied that these customers made money using Bernstein's recommended trades. In fact, these customers all lost money on their trades or failed to realize the returns they claimed in the infomercial during the time the infomercial aired. In addition, these customers for the most part did not even trade using Bernstein's seasonal methodology. Accordingly, the NFA believed that the infomercial's claim of the traders' successes violated Compliance Rules 2-29(a)(1) (prohibiting communications with the public that operate as a fraud or deceit), (b)(1) (prohibiting use of promotional material that is likely to deceive the public) and (b)(2) (generally prohibiting use of promotional material that contains material misstatements of fact).

Lastly, the NFA believed that the infomercial and web site falsely stated that Bernstein was a successful trader. Bernstein provided the NFA with monthly statements from November 1992 through November 1996 for MBH's proprietary account, through which he made his own trades. The NFA's analysis of this account showed that the account had lost $3,286.33 during 1992, $8,499.13 during 1993, $1,793.82 during 1994, $14,300.26 during 1995, and $8,374.34 during the first 11 months of 1996. Accordingly, the NFA believed that Bernstein's claim that he was a successful trader violated Compliance Rules 2-29(a)(1) and (b)(1).

4.

As a result of its investigation, the NFA requested that Bernstein stop airing the infomercial. In turn, Bernstein relayed this request to El-Batrawi. (Remember, Bernstein had contracted away his ability to control airing of theinfomercial, so, presumably, his only recourse was to ask that El-Batrawi honor the NFA's request.) After initial resistance, El-Batrawi agreed to stop airing the infomercial, and Genesis pulled it off the air sometime in July

1996. While the infomercial was off the air, Bernstein attempted to revise its script to address the NFA's concerns. Ultimately, the NFA did not accept the revised script because the script did not include disclaimers about hypothetical results. When Bernstein informed El-Batrawi of this, El-Batrawi lost patience and began re-airing the infomercial in October or November 1996, notwithstanding its alleged non-compliance with NFA rules.

B.  Proceedings Below

Following its review of the infomercial and web site, the NFA filed a four-count complaint against Bernstein and MBH, alleging various violations of the NFA's Compliance Rules. Specifically, count one of the complaint charged Bernstein and MBH with violating Compliance Rules 2-29(a)(1), (b)(1) and (b)(2) by presenting misleading information in the infomercial and web site. Count two alleged that Bernstein and MBH violated Compliance Rule 2-29(b)(3) because the infomercial and web site promised profit without giving equal prominence to the risk of loss. Count three alleged that Bernstein and MBH violated Compliance Rule 2-29(a)(3) because the infomercial represented that futures trading was appropriate for all persons. Lastly, count four alleged that the infomercial and web site failed to disclose the limitations of using hypothetical performance results, as required by Compliance Rule 2-29(c)(1). Bernstein and MBH denied the allegations and requested a hearing before an NFA panel in accordance with Part Three of the NFA Compliance Rules. See also 7 U.S.C. sec. 21(b)(9); 17 C.F.R. sec. 170.9.

After briefing by both parties, the assigned NFA panel issued a decision finding Bernstein and MBH liable on all counts. As a sanction, the panel barred both Bernstein and MBH from the NFA for a period of 18 months, after which both could reapply for membership. In addition, the panel imposed a $200,000 fine on Bernstein and MBH, for which they incurred joint and several liability. The parties appealed to the NFA's three-person Appeals Committee, and the Committee affirmed the panel decision in all respects. The parties then appealed to the CFTC. The CFTC summarily affirmed

the NFA decision, adopting the NFA'sfindings and conclusions after applying a weight of the evidence standard of review as dictated by 17 C.F.R. sec. 171.34. Bernstein and MBH now appeal to this court.

## II.  DISCUSSION

Bernstein raises three arguments on appeal: (1) that the CFTC erred by summarily affirming the NFA decisionwithout making its own, independent findings of fact; (2) that the CFTC erred by failing to make the findings required by 7 U.S.C. sec. 21(i); and (3) that the NFA violated his due process rights by applying novel constructions of Compliance Rule 2-29 to him.

## A.  The CFTC's Standard of Review

Bernstein first argues that 7 U.S.C. sec. 21(i) requires de novo fact finding, rather than the weight of the evidencereview that the CFTC chose. As an initial matter, we note that Bernstein does not precisely define what he believes de novo fact finding to entail. However, we infer from his briefs that he understands de novo fact finding to require not that the CFTC draw its own inferences from the facts found by the NFA, but that the CFTC set aside the facts found by the NFA in favor of making its own determination, possibly through the admission of additional evidence that was not presented to the NFA.

Bernstein's argument in favor of his version of de novo review rests upon sec. 21(i), which states:

(1) In a proceeding to review a final disciplinary action taken by a registered futures association against a member thereof or a person associated with a member, after appropriate notice and opportunity for a hearing (which hearing may consist solely of consideration of the record before the association and opportunity for the presentation of supporting reasons to affirm, modify, or set aside the sanction imposed by the association)--

(A) if the Commission finds that--

(i) the member . . . has engaged in the

acts or practices . . . that the
association has found the member . . . to
have engaged in . . .;

(ii) the acts or practices . . . are in
violation of the rules of the association
. . .; and

(iii)  such rules are, and were applied
       in a manner, consistent with the
       purposes of this chapter,

the Commission, by order, shall so
declare and, as appropriate, affirm the
sanction imposed by the association . . .
.

* * *

(3) In a proceeding to review the denial
of membership in a registered futures
association or the barring of any person
from being associated with a member,
after appropriate notice and opportunity
for a hearing (which hearing may consist
solely of consideration of the record
before the association and opportunity
for the presentation of supporting
reasons to affirm, modify, or set aside
the action of the association)--

(A) if the Commission finds that--

(i) the specific grounds on which the
denial or bar is based exist in fact;

(ii)  the denial or bar is in
accordance with the rules of
the association; and

(iii) such rules are, and were applied in
a manner, consistent with the purposes of
this chapter,

the Commission, by order shall so declare
and, as appropriate, affirm or modify the
action of the association, or remand the
case to the Commission for further
proceedings . . . .

7 U.S.C. sec. 21(i). Believing the
statute to be ambiguous with regard to
the standard of review, the CFTC chose a
standard of review to govern its
evaluation of NFA disciplinary decisions
by proposing in 1990, and eventually
adopting, a weight of the evidence
standard. See 17 C.F.R. sec. 171.34;
Commission Review of National Futures
Association Decisions in Disciplinary,

Membership Denial, Registration and Membership Responsibility Actions, 55 Fed. Reg. 24,254 (June 15, 1990) (codified at 17 C.F.R. sec. 171.34). Under the weight of the evidence standard, the Commission:

does not mechanically reweigh the evidence to ascertain in which direction it preponderates. The Commission focuses its inquiry on whether the fact finder acted reasonably in reaching material findings in light of the evidence . . . the reasonable inferences drawn therefrom, and other pertinent circumstances.

55 Fed. Reg. at 24,256. "Several courts have equated the 'weight of the evidence' standard with the 'preponderance of the evidence' standard used in other contexts." Monieson v. CFTC, 996 F.2d 852, 858 (7th Cir. 1993) (and cases cited therein). Bernstein disagrees with the CFTC's interpretation of sec. 21(i), arguing that it mandates de novo fact finding./3

In light of the Commission's use of notice-and-comment procedures in adopting the weight of the evidence standard, the Commission points us to "the well established canon [frequently referred to as the Chevron doctrine] 'that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.'" Geldermann, Inc. v. CFTC, 836 F.2d 310, 315 (7th Cir. 1987) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)). While Chevron deference "is not abject deference," United Transp. Union-Ill. Legislative Bd. v. Surface Transp. Bd., 169 F.3d 474, 476 (7th Cir. 1999), "courts must defer to the agency's interpretation [of a statute] so long as it is 'a permissible construction of the statute.'" Stinson v. United States, 508 U.S. 36, 44 (1993) (quoting Chevron, 467 U.S. at 842-43).

The Chevron analysis is accomplished in two steps: first we examine the text of the relevant statute to determine whether its plain meaning controls the agency interpretation. If, on the other hand, the statute is ambiguous, the agency's interpretation governs if it is reasonable.

1.

   Here, the first step of the Chevron analysis is easily disposed of. Bernstein argues that the statute plainly mandates de novo fact finding because it requires the CFTC to make certain findings in connection with its decision. See 7 U.S.C. sec. 21(i)(1)(A)(i) & (3)(A)(i). Bernstein supports his argument by noting that "find" is defined as "[t]o come upon by seeking or effort . . . [t]o discover; to determine; to locate; to ascertain and declare." Black's Law Dictionary 631 (6th ed. 1990). From this definition, Bernstein concludes that "the plain meaning of a command to find a fact is to make an actual determination as to the fact's existence (or non-existence)." Appellant's Reply Br. at 7. This is nonsense. An appellate body may make a "finding" based on its own investigation or, more commonly, based on a record made below. Therefore, while sec. 21(i) requires that the CFTC make certain findings of fact, it does not dictate whether the CFTC's factual findings must result from a de novo or a weight of the evidence review.

   Bernstein also cites to the parenthetical language of sec. 21(i)(1) & (3), which states that the CFTC's hearing "may consist solely of consideration of the record before the association and opportunity for the presentation of supporting reasons to affirm, modify, or set aside the sanction imposed by the association." But this language obviously cuts against Bernstein, for it does not prescribe a standard of review--it merely describes the record upon which the CFTC may base its decision. That the record may be closed on appeal does nothing to dictate a de novo standard of review. Indeed, this court applies the clearly erroneous standard--rather than the de novo standard--to a closed-record review of factual determinations by lower courts. See, e.g., Fed. R. App. P. 10(a); Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 462 (7th Cir. 2000) (factual findings will not be disturbed unless they are clearly erroneous)./4

2.

   Having found the language of sec. 21(i) to be silent as to the appropriate

standard of review, we can proceed to the second step of Chevron, a determination of the reasonableness of the CFTC's interpretation. In this step, we take into account extrinsic sources that include not only legislative history, but also "the consistency of the agency's interpretation, the contemporaneousness of the interpretation, and the robustness of the regulation following congressional re-enactment of the underlying statute." Bankers Life & Casualty Co. v. United States, 142 F.3d 973, 983 (7th Cir. 1998). Bernstein relies on these factors to make arguments in favor of de novo review based on: (1) the SEC's use of de novo review in appeals of National Association of Securities Dealers, Inc. (NASD) disciplinary proceedings; (2) the structure of the CEA; and (3) the legislative history of the CEA.

i.

The SEC--which, under 15 U.S.C. sec. 78s, is subject to statutory requirements for reviewing securities association disciplinary decisions that are virtually identical to the CFTC's--apparently reviews NASD disciplinary actions de novo. See, e.g., Shultz v. Securities & Exchange Comm'n, 614 F.2d 561, 568 (7th Cir. 1980). Even though this might be Bernstein's most telling point, he has merely pointed out this inter-agency discrepancy without making the obvious point that two agencies should not draw conflicting conclusions from similar language. See Rapaport v. United States Dept. of the Treasury, Office of Thrift Supervision, 59 F.3d 212, 216-17 (D.C. Cir. 1995) (one agency's interpretation of a statute is not entitled to deference when several other agencies share administration of the statute). But here there appears to be a sound basis for the SEC and CFTC's conflicting interpretations of similar statutorylanguage.

Perhaps most obviously, the statute guiding the SEC (the Securities Exchange Act, of which 15 U.S.C. sec. 78s is relevant here) and the statute guiding the CFTC (the CEA) are different statutes, which have a different history, even though they now contain similar language applicable to disciplinary proceedings./5 More importantly, if any interpretation needs to be declared

unreasonable, the SEC's use of a de novo standard of review appears the better candidate, for in amending the SEA Congress stated that "[t]he scope of the hearings [to review disciplinary sanctions] would be within the discretion of the appropriate regulatory agency, thus permitting the agency to consider the matter de novo if it deems this appropriate or simply on the record before the self-regulatory agency as would be the normal situation." S. Rep. No. 94-75, at 132 (1975) (emphasis added). Thus, sec. 78s appears at best to grant the SEC discretion to choose a standard of review, and certainly does not dictate a de novo standard of review. Likewise, sec. 21(i) grants discretion to the CFTC, even if this means that the CFTC and SEC may reach different conclusions in exercising their discretion.

ii.

Bernstein also argues that the structure of the CEA supports the inference that sec. 21(i) requires de novo fact finding. Bernstein begins his argument by noting that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)). Thus, because sec. 21(i) does not explicitly mandate a weight of the evidence review for disciplinary actions--whereas sec. 21(o) specifically prescribes this standard for the review of registration actions-- Bernstein argues that Congress must have intended for the CFTC's review of disciplinary actions to be de novo.

However, given the similar reputational and financial consequences that attach to parties under both sec. 21(i) membership actions and sec. 21(o) registration actions, it would make little sense to apply differing standards of review to each. Further, sec. 21(i) explicitly states that the CFTC is only required to "review" final disciplinary decisions of the NFA, and that the CFTC may limit its review to the record below. In "reviewing" NFA decisions, the CFTC is

acting in an appellate capacity, and appellate tribunals generally do not make de novo factual determinations. See Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1439 (7th Cir. 1986). Lastly, de novo review would require the CFTC to ignore the NFA's own "expertise in evaluating factual issues in the context of day-to-day industry practice." Commission Review of National Futures Association Decisions in Disciplinary, Membership Denial, Registration and Membership Responsibility Actions, 55 Fed. Reg. 24,254, 24,256 (June 15, 1990). For all of these reasons, we cannot conclude that the CFTC has adopted an unreasonable reading of sec. 21(i), even if sec. 21(o) explicitly mandates a weight of the evidence review while sec. 21(i) does not.

iii.

We lastly address Bernstein's argument that the pre-amendment version of sec. 21(i) required de novo review and that Congress' 1986 amendment of sec. 21(i) was not intended to alter this requirement. This argument requires two steps. First, Bernstein argues that sec. 21(i), as originally written, clearly mandated a de novo standard of review. Second, Bernstein points to a report of the House Committee on Agriculture that he believes indicates Congress' intent to preserve in the amended version of sec. 21(i) the de novo standard of review allegedly called for by the original version of sec. 21(i). Both steps of Bernstein's argument are questionable.

As originally written, sec. 21(i) allowed the Commission to consider not only the record before the NFA, but also "such other evidence as it may deem relevant." Commodity Futures Trading Commission Act of 1974, Pub.L. 93-463, Title III, sec. 301, 88 Stat. 1406 (emphasis added). Accordingly, the Commission was not originally required to consider every piece of evidence offered by parties on appeal, but only the evidence that it deemed relevant. Thus, even if de novoreview was required whenever the Commission considered new evidence, the Commission was never required to consider new evidence by the original version of sec. 21(i). Accordingly, the original version of sec. 21(i) left the appropriate standard of

review to the CFTC's discretion--it did not mandate de novo review.

In addition, we are not convinced that Congress intended to perpetuate a de novo standard with the 1986 amendment to sec. 21(i). Bernstein believes otherwise, citing only the House Committee on Agriculture report in support. However, the only statement in the report coming even close to a discussion of the standard of review merely notes that "ac tual standards for commission review of any association decision, however, would remain essentially unchanged." H.R. Rep. No. 99-624, at 11 (1986) (emphasis added). The report's use of the modifier "essentially" deprives this statement of whatever force it might otherwise have in advancing Bernstein's argument./6

Further, the report cited by Bernstein is not the only congressional report to address the meaning of the language employed in sec. 21(i). In describing the 1975 amendment of sec. 15A of the Securities Exchange Act of 1933 (codified at 15 U.S.C. sec. 78s), which contains language virtually identical to the current text of sec. 21(i), the Senate Committee on Banking, Housing and Urban Affairs stated that the scope of the hearings reviewing self-regulatory association disciplinary proceedings "would be within the discretion of the appropriate regulatory agency, thus permitting the agency to consider the matter de novo if it deems this appropriate or simply on the record before the self-regulatory agency as would be the normal situation." S.Rep. No. 94-75, at 132 (1975) (emphasis added). Accordingly, regardless of what Congress thought of the earlier version of sec. 21(i), Congress apparently believed that the new language would leave the standard of review entirely to the discretion of the agency, which would normally limit itself to the record before the self-regulatory agency and not apply de novo review.

3.

We lastly note that under the Administrative Procedure Act, we will not reverse an agency determination unless an error is prejudicial. See 5 U.S.C. sec. 706; see also Braniff Airways, Inc. v. Civil Aeronautics Bd., 379 F.2d 453, 466

(D.C. Cir. 1967). While Bernstein argues in favor of de novo review, he offers almost no facts that the CFTC would have found in his favor had the NFA's factual determinations been subject to this more stringent standard. Bernstein's briefs state only that "the CFTC's review left open the possibility that, had it conducted de novo review, it might have reached different conclusions than did the NFA." Appellant's Br. at 24 n.29. And when specifically asked at oral argument what facts would change under de novo review, Bernstein's counsel only said that:

[I]f the Commission had conducted a de novo review of the facts . . . the Commission would have discovered that [the] National Futures Association had interpretations of its rules, specifically Rule 2-29. Rule 2-29(a) required, pursuant to the interpretation, a scienter requirement. . . . [The NFA] did not find that.

However, the NFA's alleged failure to make a required finding goes more to the question whether the NFA complied with its own, as well as the CFTC and CEA's rules, which is a question of law, not of fact. Indeed, the only fact challenged by Bernstein upon sustained questioning at oral argument was the NFA's finding that the infomercial and web site were misleading. But Bernstein cited to no evidence that suggested the success of a challenge to that seemingly unassailable finding. Regardless, because we do not consider arguments raised for the first time during oral argument, see United States v. Rodriguez, 888 F.2d 519, 524 (7th Cir. 1989), we need not consider this point. Accordingly, even if we had determined that de novo review was warranted in this case, we would have seen no good reason to reverse.

B. Findings Required by sec. 21(i)(1) & (3)

Bernstein next argues that, in its summary opinion, the CFTC failed to make the findings and declarations required by 7 U.S.C. sec. 21(i)(1) & (3). The required declarations include a finding that the member engaged in the acts that the NFA found the member to have engaged in, sec. 21(i) (1)(A)(i) & (3)(A)(i); that the member's acts are in violation

of NFA rules, sec. 21(i)(1)(A)(ii) & (3)(A)(ii); and that the rules have been applied in a manner that is consistent with the CEA, sec. 21(i)(1)(A)(iii) & (3)(A)(iii).

Here, the CFTC determined that the findings and conclusions of the NFA were supported by the weight of the evidence and that the NFA committed no error material to the outcome of the case. As such, the CFTC clearly met the requirements of sec. 21(i)(1)(A)(i) & (ii), as well as sec. 21(i)(3)(A) (i) & (ii). Further, on appeal to the Commission, Bernstein argued that the NFA erred by applying Rule 2-29 in a manner that was inconsistent with the purpose of the CEA. Since this argument was raised before the Commission, it was necessarily resolved by the Commission's order of summary affirmance. Accordingly, the requirements of sec. 21(i)(1) (A)(iii) & (3)(A)(iii) were satisfied as well, for the Commission implicitly found that the NFA applied its rules in a manner consistent with the CEA.

We are also (just barely) satisfied that the CFTC order of summary affirmance met sec. 21(i)'s requirement that the CFTC declare its findings. We will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). Here, the CFTC did not explicitly state its path, but the path is nonetheless easily discerned, for the CFTC adopted the NFA's findings and conclusions, finding no material error in the NFA proceedings. Bernstein argues that the CFTC's decision is not clear enough because it does not state what the non-material errors are. However, the non-material errors are, by definition, not material and need not be elaborated on. Accordingly, the CFTC has here made all of the findings and declarations required by sec. 21(i).

Because we believe that in this case the Commission's order of summary affirmance met the bare minimum of sec. 21(i)'s finding and declaration requirements, we need not address the Commission's argument that its occasional use of summary orders, codified at 17 C.F.R. sec. 171.33(b), is entitled to Chevron deference. However, we note that given

sec. 21(i)'s express requirement that the CFTC make and declare findings, it is difficult to imagine that the Commission's use of summary affirmance orders--which need not set forth any reasoning or findings of fact--will never run afoul of sec. 21(i).

C.  The CFTC's Application of sec. 21(i)

  Bernstein lastly argues that the CFTC allowed the NFA to apply Rule 2-29 in a manner that violated his due process rights. Bernstein's first argument along these lines, his claim that the Commission deprived him of his due process rights by failing to conduct its own fact finding, has already been disposed of; because the Commission was not required to find its own facts, the Commission did not violate Bernstein's due process rights by failing to do so. Bernstein's second argument, which we address here, is that his due process rights were violated because both the NFA and the CFTC applied expansive readings-- of which he had no notice--of the NFA Compliance Rules to him./7 In particular, Bernstein argues: (1) that the NFA enforced a novel construction of Compliance Rule 2-29(a)(1); (2) that the NFA enforced a novel construction of Compliance Rule 2-29(b)(1); (3) that the NFA enforced a novel construction of Compliance Rules 2-29(a) & (b); and (4) that the CFTC erred by affirming interpretations of NFA rules that amounted to impermissible rule changes. Bernstein does not appear to be taking issue with the NFA's interpretive notices, which the NFA publishes as its own rule interpretations (but which are apparently not approved by the CFTC pursuant to 7 U.S.C. sec. 21(p)). However, Bernstein does contest what he alleges to be novel applications of Compliance Rule 2-29 and the NFA's interpretive notices construing it.

  The standard of review we apply to legal questions that have been decided by an agency (such as Bernstein's due process arguments here) "depends on the nature of the question and the comparative qualifications and competence of the decisionmakers." Monieson v. CFTC, 996 F.2d 852, 858 (7th Cir. 1993) (citing Morris v. CFTC, 980 F.2d 1289, 1293 (9th Cir. 1992)). Here, the question is one of

both statutory interpretation (whether the NFA rules and their interpretations are consistent with the CEA) and due process (whether the NFA rules and their interpretations were fairly applied). Because these are both issues that courts commonly encounter, we review these aspects of the CFTC's decision de novo.

1.

Bernstein first argues that the NFA improperly applied Rule 2-29(a)(1), which states that "[n]o Member or Associate [of the NFA] shall use any promotional material which . . . is likely to deceive the public." The NFA interpretive notice that discusses this rule states that a disciplinary panel will not find a violation of the rule without a determination that the member acted with fraudulent intent or recklessness. See NFA Interpretive Notice para. 9003. While Bernstein does not contest the CFTC's finding that he acted recklessly in contracting away ultimate control of the infomercial and web site, he argues that the finding does not satisfy the NFA Interpretive Notice's scienter requirement because there is a difference between "reckless business practices unrelated to truth or falsity" and "recklessly false speech."

While there may, in certain circumstances, be a difference between "reckless business practices" and "recklessly false speech," the distinction is non-existent here. Cast in traditional legal terms, Bernstein's argument reduces to a claim that, as expressly stated in the marketing agreement, Genesis operated as an independent contractor, and that, under the common law of independent contractor relationships, he is not liable for Genesis' misleading marketing tactics. See, e.g., General Building Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 396 (1982) (noting "the common-law rule that a principal normally will not be liable for the tortious conduct of an independent contractor"). However, there is an important exception to this rule in that a non-delegable duty may not be discharged by using care in delegating it to an independent contractor. See id. at 395./8

Here, Bernstein's duties under

Compliance Rule 2-29 are clearly non-delegable. The NFA Hearing Committee held as much when it stated that:

MBH and Bernstein's behavior in contracting away the ultimate control of the promotional material was extremely reckless and was inconsistent with their obligations under NFA Compliance Rule 2-29. They cannot use their own decision to give up control as an excuse.

In the Matter of MBH Commodity Advisors, Inc., NFA Case No. 96-BCC-015, at 29 May 5, 1998. And contrary to Bernstein's argument, this is not a new interpretation of Compliance Rule 2-29. Rather, it is the application of an established legal principle, and it should not surprise Bernstein in the slightest. Indeed, Bernstein's argument--which reduces to the claim that someone who helps prepare, approves of, and appears in a misleading infomercial should not be liable because he was not responsible for airing the infomercial--makes little legal or policy sense, and Bernstein should not be surprised that he cannot contract away liability for duties that he assumed by virtue of his membership in the NFA. Accordingly, the NFA did not apply a novel interpretation of Rule 2-29(a)(1) to Bernstein.

 With respect to the web site, Bernstein's case is slightly more sympathetic. Indeed, Bernstein claims that he was not even aware of the site until notified by the NFA. (While this observation is not relevant to the outcome of this case, we note that the web site was mentioned in the infomercial. Because Bernstein helped to prepare--and signed off on--the infomercial's script, Bernstein's assertion that he did not know of the site until notified by the NFA is somewhat suspect.) Nonetheless, because the web site was implemented as part of the marketing agreement with Genesis, the site implicates Bernstein's non-delegable duties under Rule 2-29. Bernstein's imprimatur on the web site made Compliance Rule 2-29 applicable to the site, and Bernstein cannot now hide behind Genesis to rid himself of liability for the web site's failure to comply with NFA rules.

2.

Bernstein next argues that the NFA and CFTC enforced a novel construction of Compliance Rule 2-29(b)(1) by applying it to the web site. Compliance Rule 2-29(b)(1) states that "[n]o Member or Associate [of the NFA] shall use any promotional material which . . . is likely to deceive the public." The guidance accompanying this rule states that "[o]f course, to find a violation of this Subsection, a Business Conduct Committee would have to find that the Member or Associate reasonably should have been able to determine that the material was likely to deceive." NFA Interpretive Notice para. 9003. The NFA and CFTC found that Bernstein had violated the rule by claiming in the web site that he was a successful trader in spite of the fact that his trading account annually lost money between 1992 and the first 11 months of 1996. Here, Bernstein accepts the fact that the web site was misleading, but argues that the NFA and CFTC failed to find that he should have known that the site was misleading. Again, Bernstein's argument borders on the frivolous; where--as here--the promotional material is so obviously deceptive that no reasonable person could believe otherwise, it is not necessary for the NFA to explicitly set forth its finding that Bernstein should havereasonably known the material to be misleading.

3.

Bernstein further argues that the NFA and CFTC erred in applying Compliance Rule 2-29(a) and (b) to him. Compliance Rule 2-29(a) states that "[n]o Member or Associate [of the NFA] shall make any communication with the public" that has certain content. Compliance Rule 2-29(b) states that "[n]o Member or Associate [of the NFA] shall use any promotional material" that has certain content. Bernstein argues that he is not subject to Compliance Rule 2-29(a) and (b) because it was Genesis, not he, that "communicated with the public" and "used promotional material." As already noted, Bernstein may not use Genesis to shield himself from liability for the misleading communications with the public that occurred through the infomercial and web site. Accordingly, this argument also

fails.

4.

Bernstein lastly argues that, in disciplining him for the web site, the CFTC erred in affirming interpretations of NFA Rules that amounted to illegal rule changes. In support of his argument, Bernstein notes that under 7 U.S.C. sec. 21(j), the NFA is required to submit all proposed rule changes to the CFTC prior to implementation. See also General Bond & Share Co. v. SEC, 39 F.3d 1451, 1458 (10th Cir. 1994) (NASD interpretive notice that "established a new standard of conduct" was a rule change that required the NASD to seek SEC approval). Because "there was no indication [prior to this proceeding] that Rule 2-29 reached beyond 'communication between the member and the public' to impose more general requirements to retain control of promotional material so that others may not misuse it," Appellant's Br. at 37, Bernstein believes that "stretching Rule 2-29 to cover material that Bernstein and MBH did not make or broadcast created a new standard of conduct under the rule." Id. This argument essentially rehashes Bernstein's previous arguments, and we pause only to reiterate that, for purposes of fulfilling the obligations imposed by Rule 2-29, a member of the NFA cannot hide behind a third party with which it has contracted. This is a traditional legal principle and, contrary to Bernstein's argument, does not create a new rule. Accordingly, General Bond is distinguishable from the instant case, and the CFTC did not violate Bernstein's due process rights.

III.  CONCLUSION

For the foregoing reasons, the decision of the Commodity Futures Trading Commission is

Affirmed.

FOOTNOTES

/1 During the relevant period, Bernstein was a principal of MBH, as well as its president. For convenience, we will collectively refer to Bernstein and MBH as "Bernstein" for the remainder of this opinion.

/2 The Commodities Exchange Act (CEA), 7 U.S.C. secs. 1-25, governs the trading of commodity futures contracts, and grants to the CFTC authority to implement its regulatory regime. See, e.g., 7 U.S.C. sec. 4a(j). One duty of the Commission, conferred in 1974, is the registration of futures associations. See 7 U.S.C. sec. 21; 17 C.F.R. pt. 170. On September 22, 1981, the Commission registered the NFA as the first, and so far only, self-regulatory futures association. See generally Philip McBride Johnson & Thomas Lee Hazen, Commodities Regulation 1-243 (3d ed. 1998).

/3 Bernstein did not raise this argument before the CFTC even though the CFTC has clearly stated in its regulations that it interprets sec. 21(i) to require only a weight of the evidence review. See 17 C.F.R. sec. 171.34. The government thus believes that Bernstein has waived this argument by failing to make it below. See Sims v. Apfel, 120 S.Ct. 2080, 2084-85 (2000) ("[C]ourts require administrative issue exhaustion 'as a general rule' because it is usually 'appropriate under [an agency's] practice' for 'contestants in an adversary proceeding' before it to develop fully all issues there.") (quoting United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 36-37 (1952)). However, the CFTC addressed the standard of review issue in its order of summary affirmance, explicitly finding there that the NFA's findings and conclusions were "supported by the weight of the evidence." MBH Commodity v. NFA, CFTC Docket No. CRAA 99-3 (Mar. 31, 2000). Consequently, the issue was properly adjudicated, and Bernstein may present it to this court for decision. See Watson v. Henderson, 222 F.3d 320, 322 (7th Cir. 2000) ("[A]n issue may be deemed exhausted if . . . actually addressed by the agency.").

/4 Bernstein also argues that de novo review is warranted because sec. 21(i) triggers the protections of sec. 554 of the Administrative Procedure Act, 5 U.S.C. sec. 554. However, assuming that this case is a "case of adjudication required by statute to be determined on the record after opportunity for an agency hearing," as required by sec. 554(a), the APA does not require that the CFTC review NFA disciplinary decisions de novo, and Bernstein does not point to any such provision in the APA, arguing only that "a Section 17(i) proceeding trigger[s] the protections of Sections 554, 556 and 557 of the APA . . . ." Appellant's Br. at 19. But none of these sections so much as mention the term de novo, and we certainly do not understand them to require the CFTC to apply de novo review to NFA disciplinary proceedings.

/5 Indeed, the history of the statutes' amendments convincingly shows that Congress does not necessarily consider the statutes to serve identical purposes: while Congress amended sec. 78s in 1975, changing the text that governs the SEC's review of NASD disciplinary decisions to what it is today, Congress did not alter the language of sec. 21(i) until 1986, over 10 years later. Accordingly, it is difficult to conclude that Congress truly wished the statutes to be interpreted alike, even if the CEA was eventually amended to match the language of the SEA.

/6 In what we hope was an unintentional mistake, Bernstein's brief omits the word "essentially" from its quotation of this report. See Appellant's Br. at 17. In some contexts a minor quotation error is of little import. However, in the statutory interpretation context--where every word counts, especially a modifier like "essentially" that has the power to change the meaning of a sentence--minor quotation errors can lead to major reasoning errors. Bernstein's omission thus emphasizes the need for diligent quotation checking in briefs before this court.

/7 Bernstein charges the NFA and CFTC with identical due process failures. With respect to the NFA, Bernstein must, of course, establish that the NFA is a state actor before he can argue that it is subject to the due process requirements established by the U.S. Constitution. See R.J. O'Brien & Assocs. v. Pipkin, 64 F.3d 257, 262 (7th Cir. 1995) (defendant must be a state actor in order to be subject to the Constitution's due process requirements). Because we find that the CFTC did not violate Bernstein's due process rights--and, thus, that the NFA did not violate Bernstein's due process rights either--we need not address the question whether the NFA is a state actor.

/8 For the purpose of our analysis, we will assume that Genesis was acting as an independent contractor. We have our doubts that this is truly the relationship, especially with regard to the infomercial since Bernstein seems to have been allowed a substantial amount of power over the infomercial's content (thus making it more of a principal/agent relationship). The contract between Genesis and Bernstein characterized their relationship as such, and while a contract's characterization does not necessarily govern, it does not really matter what kind of relationship existed between Bernstein and Genesis, for in neither agency nor independent contractor relationships may a master escape liability for a servant's failure to adhere to a non-delegable duty.