In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3007

ILYA PETROVICH GUTNIK,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A71 164 986

ARGUED SEPTEMBER 6, 2006—DECIDED NOVEMBER 29, 2006

Before ROVNER, EVANS, and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge.* Ilya Petrovich Gutnik is a 26-year-old native and citizen of Ukraine who came to live in the United States with his parents as a legally admitted refugee in 1993 when he was 14 years old. Twenty months later, he adjusted his immigration status and became a lawful permanent resident, the first of many steps on the path to becoming a U.S. citizen. Unfortunately for Gutnik, his path was interrupted by convictions for four violations of Illinois law between 1999 and 2001. These matters prompted the then-Immigration and Naturalization Service (INS) (now the Department of Homeland Security) to institute removal proceedings against him. When the immigration judge (IJ), later affirmed by the Board of

Immigration Appeals (BIA), found Gutnik removable as charged but granted his application for withholding of removal, Gutnik filed this petition for review, challenging both the application of particular removal grounds to some of his convictions and the IJ's conclusions as to the unavailability of certain forms of relief from removal.

Gutnik is Jewish, and during his time in Ukraine,[1] both before and after the collapse of the former Soviet Union, he and his family were on the receiving end of substantial persecution for their ethnicity and religious beliefs. The family (Gutnik, his parents, and his younger brother) fled Ukraine and entered the United States as refugees under the Lautenberg Amendment. *See* Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990 § 599D, Pub. L. No. 101-167, 103 Stat. 1195 (1989). After the one-year waiting period under 8 U.S.C. § 1159(a)(1) expired, Gutnik adjusted his immigration status and became a lawful permanent resident. Because the adjustment of status by a refugee operates retroactively, *see id*. § 1159(a)(2), Gutnik was regarded as admitted for permanent residence as of August 27, 1993, the exact date when he arrived in the United States. This backdating is

---

[1] There continues to be confusion over whether to use the article "the" in connection with "Ukraine." In the briefs, Gutnik's counsel uses "the Ukraine," while the government uses "Ukraine." Likewise, at joint remarks in January 2005, Vice President Cheney used "the Ukraine," while President Yushchenko, the elected leader of the country, used "Ukraine." *See* Press Release, Office of the Vice President, Vice President's Remarks with Ukrainian President Yushchenko (Jan. 26, 2005) (Villa Decius, Krakow, Poland). We will use Ukraine, which is not only correct but is also preferred by Ukrainians themselves, *see* Associated Press, *Terminology of Nationalism*, N.Y. Times, Dec. 3, 1991, at A10, and is the grammatically consistent choice, *see* Andrew Gregorovich, *Ukraine or "The Ukraine"?*, FORUM Ukrainian Review No. 90, Spring/Summer 1994.

significant because it enables a noncitizen to seek U.S. citizenship at least a full year earlier than would otherwise be possible. Rather than waiting 5 years from early 1995 when he adjusted his status, Gutnik could have undertaken the naturalization process as soon as August 23, 1998, so long as he maintained his U.S. residency and stayed out of trouble until that time. Ultimately, his parents and younger brother completed the naturalization process and became U.S. citizens.

But Gutnik had problems. Not long after those 5 years passed, he pled guilty to possession of drug paraphernalia in Cook County, Illinois. This started a 3-year habit of running into trouble with the law. He was convicted of that crime on February 4, 1999. Three other convictions followed: on May 24, 2000, for retail theft; on March 29, 2001, for possession of a controlled substance (.4 grams of heroin); and on May 10, 2001, for a second retail theft. As we said, these activities[2] brought Gutnik to the attention of INS, and in early 2002 it served him with a notice to appear for deportation proceedings.

INS ultimately charged that Gutnik was removable on three separate grounds: (1) the two retail theft offenses were multiple convictions for crimes of moral turpitude under 8 U.S.C. § 1227(a)(2)(A)(ii); (2) his 1999 conviction for possession of drug paraphernalia and 2001 heroin possession offense each constituted crimes relating to a controlled substance under § 1227(a)(2)(B)(i); and (3) his conviction for heroin possession was also an aggravated felony under § 1227(a)(2)(A)(iii). In response, Gutnik disputed the INA's

---

[2] Gutnik blames all of his problems on a drug addiction which he says he has licked, in part by a stay at the Rosecrance Rehabilitation Center in Rockford, Illinois. He went on, he says, to get a GED and enroll at Harper College (Palatine, Illinois), where he attained a 4.0 grade point average.

characterization for immigration purposes of his heroin and paraphernalia offenses and applied for several deferrals from removal: asylum, cancellation of removal, withholding of removal, relief under the Convention Against Torture (CAT), and a § 1159(c) waiver of inadmissability in conjunction with an adjustment of status to permanent residency.

In 2004, following a hearing, an IJ ordered Gutnik's permanent resident status terminated and denied his applications for asylum, cancellation of removal, and a waiver of inadmissability. The IJ held (1) that Gutnik's heroin possession conviction is an aggravated felony under 8 U.S.C. § 1227(a)(2)(A)(iii) rendering him ineligible for asylum; (2) that the conviction for possession of drug paraphernalia constitutes a controlled substance offense under § 1227(a)(2)(B)(i); and (3) that Gutnik was ineligible to apply for the waiver of inadmissability available to refugees under 8 U.S.C. § 1159(c) because his adjustment of status to a permanent resident in 1995 terminated his refugee status. At the same time, the IJ found Gutnik's testimony to be credible, noting that he had suffered past persecution on the basis of his ethnicity and religious beliefs and would be likely to do so again if he was returned to Ukraine; he therefore granted Gutnik's request for withholding of removal. Having done so, the IJ declined to address Gutnik's application for relief under the CAT. On appeal, the BIA issued a brief order in accordance with the streamlining procedures of 8 C.F.R. § 1003.1(e)(5) that adopted, affirmed, and supplemented the IJ's decision.

So as things stand now, Gutnik is relieved, at least until conditions improve, from being returned against his will to Ukraine. But without a grant of asylum or a § 1159(c) waiver of inadmissability, his is a limited victory. Withholding of removal does not prevent the government from removing him to some other country, nor does it offer him any avenue to regain his permanent resident status. With this in mind, Gutnik appeals the BIA's order affirming the decision of the IJ. Our jurisdiction is provided by

8 U.S.C. § 1252(a)(2)(D) (authorizing review of constitutional claims and questions of law raised in a petition for review of removal proceedings). The IJ's decision, as supplemented by the BIA, serves as the basis for our review. *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004).

Gutnik filed his opening brief on September 19, 2005. He now admits that all of his Illinois crimes constitute convictions under the immigration laws and that he is eligible for removal from this country on the basis of two separate statutory grounds: His two convictions for retail theft are multiple crimes involving moral turpitude under § 1227(a)(2)(A)(ii), and his heroin possession conviction is a controlled substance offense under § 1227(a)(2)(B)(i). But he challenges several other conclusions of the IJ, as affirmed by the BIA.

Gutnik first argues that his heroin possession conviction, a felony in Illinois, is not an aggravated felony under § 1227(a)(2)(A)(iii) because at the federal level that crime is punishable as a misdemeanor. At the time of Gutnik's brief, this circuit had yet to adopt this so-called "hypothetical federal felony approach" for characterizing violations of state law as aggravated felonies for the purposes of § 1227(a)(2)(A)(iii). But in *Gonzales-Gomez v. Achim*, 441 F.3d 532 (7th Cir. 2006), we did just that. The government concedes the direct application of *Gonzales-Gomez*, which removes the bar to Gutnik's asylum claim. We must therefore remand to the BIA for further proceedings.[3]

---

[3] Gutnik will have his asylum application considered unless the Supreme Court rejects the position taken by this circuit in *Gonzales-Gomez* when it resolves *Lopez v. Gonzales*, 417 F.3d 934 (8th Cir. 2005), *petition for cert. granted*, 74 U.S.L.W. 3289 (U.S. April 3, 2006) (oral argument held Oct. 3, 2006). Should that occur, our remand on the aggravated felony issue will be vacated and Gutnik will be ineligible for asylum.

In fact, it appears that Gutnik has already demonstrated his eligibility for asylum.[4] As we have said, the IJ's grant of withholding of removal indicates that Gutnik established that he is more likely than not to be persecuted upon return to Ukraine. The standard of proof to demonstrate refugee status, and therefore eligibility for asylum, *see* 8 U.S.C. §§ 1101(a)(42)(A) & 1158(b)(1)(B)(i)—a "well-founded fear of persecution"—is lower. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448-49 (1987). It remains for the government to favorably exercise its discretion in granting asylum to eligible refugees. *Ghebremedhin v. Ashcroft*, 392 F.3d 241, 244 (7th Cir. 2004).

Gutnik next asks us to review the IJ's conclusion that his Illinois conviction for possession of drug paraphernalia is a violation of a law relating to a controlled substance under 8 U.S.C. § 1227(a)(2)(B)(i):

> Any alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State . . . relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

The government defends the IJ's view and points to the case upon which the IJ relied, *Luu-Le v. INS*, 224 F.3d 911 (9th Cir. 2000), where the Ninth Circuit found that an Arizona drug paraphernalia statute was indeed covered by this INA provision.

---

[4] We assume that Gutnik's loss of his lawful permanent resident status some 9 years after his arrival in the United States constitutes a changed condition that will permit him to apply for asylum even though it has been far more than a year since he arrived in the United States. *See* 8 U.S.C. § 1158(a)(2).

We find it strange that under the *Luu-Le* interpretation of the statute a noncitizen caught with a small article of paraphernalia used to consume a tiny quantity of marijuana could be removable, while a noncitizen actually caught with the drug, so long as it was less than 30 grams, would be in no such danger because of the express exception § 1227(a)(2)(B)(i) provides for small-quantity marijuana offenses. This is not merely some abstract possibility—it may well describe this case. The IJ asked Gutnik about his conviction for possession of drug paraphernalia:

> Q. And where were you arrested at that time? How was it that you were charged with possession of drug paraphernalia?
>
> A. I was in a car with—and smoking a joint, and a police officer pulled up.

This description of the events, if true, suggests that whatever "paraphernalia" Gutnik was caught with was clearly for his personal use of less than 30 grams of marijuana. Unfortunately, the record provides no further details about the conduct behind Gutnik's paraphernalia conviction, and the Illinois statute in question, 720 ILCS 600/3.5, does not limit its application to offenders holding paraphernalia that will be used with more than 30 grams of marijuana.

What we do know is that Gutnik *pled* guilty to the possession of drug paraphernalia charge. Knowing this, and based on his testimony regarding his conduct, we might deduce that he agreed to plead to the lesser paraphernalia charge rather than face conviction for marijuana possession. Yet, under the *Luu-Le* approach to § 1227(a)(2)(B)(i) urged by the government, Gutnik became deportable by pleading to the *lesser crime*. Had he instead taken his chances with the more serious conviction for marijuana possession, he would have faced no immigration consequences. Talk about absurd results.

But neither side tells us why it is necessary to decide this issue at this time. The IJ was concerned with whether the drug paraphernalia offense relates to a controlled substance because of the effect he believed the resolution of that question would have on Gutnik's application for cancellation of removal. One of the requirements to be eligible for that form of relief is to have continuous physical presence in the U.S. for 7 years. *See* 8 U.S.C. § 1229b(a). Under § 1229b(d)(1), continuous physical presence ends when a noncitizen commits a deportable offense or when he or she is served with a notice to appear, whichever occurs earlier. Gutnik was served with a notice to appear in 2002, but all of his convictions preceded that time, and the first of these was the drug paraphernalia offense in early 1999. In other words, because Gutnik arrived in the U.S. in August of 1993, the effect of the IJ's ruling that the drug paraphernalia offense made him deportable was to preclude his eligibility for cancellation of removal.

But Gutnik has since conceded that he is ineligible for cancellation of removal based upon his two retail theft convictions, *regardless of whether possession of drug paraphernalia is a deportable offense*. Beyond that, we can find no other reason why the issue now matters. As we have said, Gutnik has already conceded deportability on other grounds. His eligibility for asylum is also unaffected: the IJ has already held that none of his convictions constitute a particularly serious crime under § 1158(b)(2)(A)(ii), and there is no serious argument after *Gonzales-Gomez* that possession of drug paraphernalia in Illinois is an aggravated felony. Neither is the exercise of discretion upon review of his asylum application at stake: Criminal activity is taken into account as an adverse discretionary factor in asylum application proceedings whether or not that activity also happens to make a noncitizen removable. *See Shahandeh-Pey v. INS*, 831 F.2d 1384, 1388 (7th Cir. 1987) (describing adverse factors

properly considered at discretionary stage of asylum proceedings); *cf. Dhine v. Slattery*, 3 F.3d 613, 619 (2d Cir. 1993) ("Seven convictions over seven years—even seven misdemeanors—easily furnish a rational basis for the Attorney General's exercise of discretion.").

None of this is to suggest that Gutnik's four convictions should outweigh his fear of future persecution if returned to Ukraine, his strong family ties to the U.S., and any other discretionary factors that weigh in his favor. It is for the BIA to make that determination on remand, exercising the authority given it by the Attorney General. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999). But we simply see nothing that will change for Gutnik by our addressing this aspect of the IJ's decision, and so we decline to do so.

Finally, Gutnik appeals the IJ's decision that he is ineligible at this time to apply for a *nunc pro tunc* waiver of inadmissibility under 8 U.S.C. § 1159(c) in conjunction with an adjustment of status. Whether or not the BIA grants Gutnik's application for asylum on remand, his criminal convictions render him inadmissible to the United States under 8 U.S.C. § 1182(a), meaning that he is precluded from successfully adjusting his status to lawful permanent residency absent some form of waiver. *See generally* § 1159. If Gutnik can apply for and be granted that waiver now notwithstanding his asylum application, he can immediately try to adjust his status to lawful permanent resident status under § 1159(a), backdated to his initial date of entry in 1993. This result would also make him immediately eligible to naturalize and become a U.S. citizen.

But if he is not eligible to apply for that waiver now, Gutnik must hope for a grant of asylum and wait one year before he can apply. If a waiver is then granted, he may adjust status under § 1159(b), but he will be subject to two less favorable conditions. First, his adjustment of status will be subject to the annual numerical limitation on the

number of adjustments for asylees, *see* § 1159(b); 8 C.F.R. § 209.2(a)(1)(vi). Because history suggests that the number will be exceeded, Gutnik will be placed on a waiting list. Second, whenever he is finally able to adjust status, his lawful permanent residency will only backdate one year from the date of approval of the application. § 1159(b). In other words, it will be some time before he can seek U.S. citizenship.

Eligibility for the more desirable § 1159(a) adjustment requires that a noncitizen have been admitted to the United States as a refugee under 8 U.S.C. § 1157. We have already said that Gutnik meets the definition of refugee under 8 U.S.C. § 1101(a)(42). But in order to achieve refugee *status*, a noncitizen must do more than simply meet that definition. He must undergo an application process, which requires among other things that he have a sponsor, fill out and file a form, and undergo an interview. Gutnik went through this when he came to the United States the first time. But the government argues, and the IJ agrees, that Gutnik's formal refugee status ended when he adjusted to lawful permanent residency.

Gutnik disagrees. He contends that he continues to maintain refugee status in perpetuity because § 1101(a)(42) contains no temporal limits and the INA and subsequent regulations provide formal procedures by which the government may terminate refugee status, *see* § 1157(c)(4); 8 C.F.R. §§ 207.9, 240.35(c), and none of those procedures have been undertaken here. He also points to § 1159(a), which explains that refugees under § 1157 who adjust status shall be "*regarded as* lawfully admitted to the United States for permanent residence." § 1159(a)(2) (emphasis added). Under Gutnik's reading, the "regarded as" language says it all: after he adjusted status, he was, in legal effect, a refugee regarded as a lifetime permanent resident. Once the government successfully terminated his lawful permanent resident status, Gutnik simply reverted to being a

"mere" refugee. In his view, the government must take a further formal step, which it has not, to strip away that status.

The government counters by pointing out that adjustment of status under § 1159(a) only applies to noncitizens who have not "acquired permanent resident status." *Id.* § 1159(a)(1)(C). Gutnik may have lost his permanent resident status, but that does not negate the fact that he has already acquired it. The government has also unearthed some favorable legislative history that suggests a congressional intent for refugee status and lifetime permanent residency to exist exclusively of one another. *See*, *e.g.*, 126 Cong. Rec. S3756, 3757 (Feb. 26, 1980) (describing how new refugee status will end after one year, "after which the refugee can adjust to permanent resident status").

Where the language of the INA is ambiguous, we will ordinarily accord *Chevron* deference to the BIA's reading if it is based on a permissible construction. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999). The wrinkle here is that the BIA's decision was issued under the streamlined procedures of 8 C.F.R. § 1003.1(e). Those procedures direct a single BIA member (rather than the three-member panel traditionally used) to dispose of appeals either by affirming the IJ's opinion without order, *see* § 1003.1(e)(4), or by supplementing that opinion with a "brief order," *see* § 1003.1(e)(5).

Here the BIA followed § 1003.1(e)(5) and issued a brief order agreeing with the immigration judge and supplementing his reasoning:

> Although the respondent was admitted to the United States as a refugee under section 209 of the Act, his status was subsequently adjustment [sic] to lawful permanent resident. The respondent's contention that he remains eligible for a section [1159(c)] waiver under

these circumstances places him at an unfair advantage over other aliens and would improperly insulate him from his criminal misconduct which occurred many years after his arrival as a refugee.

We have not previously directly addressed the issue whether BIA interpretations made pursuant to the streamlined procedures of § 1003.1(e) merit *Chevron* deference, although deference appears to have been assumed in some cases. *See*, *e.g.*, *Knutsen v. Gonzales*, 429 F.3d 733, 736 (7th Cir. 2005). But Gutnik directs us to a decision from the Third Circuit, *Smriko v. Ashcroft*, 387 F.3d 279 (3d Cir. 2004), that he insists is applicable here.

The facts of *Smriko* look strangely familiar. The case involved the appeal of a citizen of Bosnia-Herzegovina admitted to the United States as a refugee but convicted of three retail theft offenses that earned him the INA's attention. 387 F.3d at 282. Like Gutnik now, Smriko argued that he maintained his refugee status even after being stripped of his permanent residency because it could only be terminated in accordance with certain enumerated grounds in the INA. *Id.* at 283. The IJ disagreed, finding without reference to supporting precedent that Smriko's refugee status ended when he adjusted to permanent residency. *Id.* at 282. The IJ ordered his removal and a single BIA member affirmed without opinion, pursuant to the streamlined procedures of 8 C.F.R. § 1003.1(e)(4). *Id.*

On appeal, the Third Circuit determined, as we do, that the INA provisions relating to the interplay between refugee and permanent resident status are ambiguous. It then noted that, although under *Chevron* and *Aguirre-Aguirre* it would usually defer to a plausible "agency answer," the IJ's decision "offered no analysis of the relevant statutory provisions," which, when combined with the single-member BIA affirmance without opinion, left the court with no analysis of the statutory interpreta-

tion issue to which it could defer. *Id.* at 288-89. The court then questioned whether the very rationale underlying *Chevron* deference could be said to apply to the streamlined procedures:

> As *Aguirre-Aguirre* determined that the *BIA*'s case-by-case decision-making should be accorded *Chevron* deference, it would seem to be, at the very least, an open question as to whether an IJ's decision affirmed through the streamlining process would be entitled to *Chevron* deference. Although the BIA has directed us to review the IJ's opinion in streamlined cases, deferring to the reasoning of an IJ from which the BIA would be free to depart in other cases would seem highly problematic.

*Id.* at 289 n.6 (emphasis in original).

Despite Gutnik's pleas to the contrary, however, his case differs from *Smriko*. Unlike in that case, the IJ's order as to Gutnik was not affirmed without opinion under 8 C.F.R. § 1003.1(e)(4); the BIA used the alternative streamlined procedures of 8 C.F.R. § 1003.1(e)(5). In other words, the BIA provided reasoning, albeit brief, to which we can defer. Even though we might interpret the statute in Gutnik's favor upon *de novo* review of the issue, we are mindful that "[j]udicial deference to the Executive Branch is especially appropriate in the immigration context." *Aguirre-Aguirre*, 526 U.S. at 416. We therefore adopt the BIA's interpretation.

But we are not finished with *Smriko*. Gutnik has made an additional argument that his case was improperly subjected to the streamlined review process in the first place because the legal issue regarding the effect of adjustment of status upon a noncitizen's refugee status is not governed by any prior BIA or federal court precedent. As a result, Gutnik argues, his case falls within one of the exceptions set forth in the streamlining regulations at 8 C.F.R. § 1003.1(e)(6)

such that his appeal of the IJ's decision should have been reviewed by a three-member BIA panel. *Cf. Smriko*, 387 F.3d at 289. Section 1003.1(e)(6) provides:

Cases may only be assigned for review by a three-member panel if the case presents one of these circumstances:

(i) The need to settle inconsistencies among the rulings of different immigration judges;

(ii) The need to establish a precedent construing the meaning of laws, regulations, or procedures;

(iii) The need to review a decision by an immigration judge or the Service that is not in conformity with the law or with applicable precedents;

(iv) The need to resolve a case or controversy of major national import;

(v) The need to review a clearly erroneous factual determination by an immigration judge; or

(vi) The need to reverse the decision of an immigration judge or the Service, other than a reversal under § 1003.1(e)(5).

In *Georgis v. Ashcroft*, 328 F.3d 962 (7th Cir. 2003), we found that the streamlined review scheme withstands constitutional challenge on due process grounds, but we also hinted at some room for courts to monitor the application of those procedures to a given case. Although Gutnik has not referenced *Georgis* in his brief, his argument sounds like an attempt to present his case as an example of a particularly troublesome hypothetical scenario that we anticipated in that decision.

In the course of considering a challenge to the use by the BIA of the streamlining procedures, we determined in *Georgis* that in most cases our ability to undertake a full review would not be affected by the propriety of the BIA's decision whether or not to streamline a case because, even

if the BIA had given us nothing to review, we could still look to the IJ's opinion. *Id.* at 967. But we also noted one example in which we believed the use of those procedures could make a significant difference. As we explained:

> Consider, on the other hand, a case that is not "controlled by existing Board or federal court precedent"; for instance, a case interpreting a new regulation. If the BIA (improperly) streamlined that case, which then came before us on appeal, it could make a slight difference whose decision we review. If we look at the IJ's, we would decide the legal issue on the merits. But if we look at the BIA's, we would simply say that the case should have been considered by a three-Member panel and remand to the BIA for consideration. And this latter course seems preferable because it gives the BIA the first crack at interpreting its own rules.

*Id.* at 967 n.4.

Although the issue was discussed in *Jarad v. Gonzales*, 461 F.3d 867 (7th Cir. 2006), we have yet to definitively determine whether we even have jurisdiction to review a BIA decision to commit an appeal to streamlined procedures. Other circuits have split on this question. *Compare Kambolli v. Gonzales*, 449 F.3d 454, 460-65 (2d Cir. 2006) (no jurisdiction), *and Tsegay v. Ashcroft*, 386 F.3d 1347, 1353-58 (10th Cir. 2004) (same), *and Ngure v. Ashcroft*, 367 F.3d 975, 983 (8th Cir. 2004) (same), *with Smriko*, 387 F.3d at 290-95 (remanding case for three-member BIA panel review), *and Chong Shin Chen v. Ashcroft*, 378 F.3d 1081, 1086-88 (9th Cir. 2004) (same), *and Haoud v. Ashcroft*, 350 F.3d 201, 206-08 (1st Cir. 2003) (same). But assuming that we do, Gutnik's case, though similar, is not the hypothetical we envisioned in *Georgis*. Like *Smriko*, *Georgis* was concerned with the situation in which the BIA affirmed the IJ without opinion under 8 C.F.R. § 1003.1(e)(4). The discussion in *Georgis* recognizes that, because (e)(4) provides that

a single BIA member "may affirm . . . if the Member determines . . . that . . . the issue on appeal is squarely controlled by existing Board or federal court precedent," we would have some concerns—again, assuming jurisdiction—if the novel issue reached by the IJ here were simply affirmed without opinion.

We point out again that for Gutnik, the BIA issued a brief order under the (e)(5) procedure. That provision does not expressly require the reviewing single Board member to abstain from resolving issues not controlled by existing precedent. Instead, it says only that "the Board member shall issue a brief order affirming, modifying, or remanding the decision under review, unless the Board member designates the case for decision by a three- member panel . . . ." 8 C.F.R. § 1003.1(e)(5). We read (e)(4) and (e)(5) together to require only that the BIA not review cases resolving novel issues by affirmance without opinion. At that point, the single BIA member may elect to refer the appeal to a three-member panel, but there is no requirement that she do so.

It may well be preferable as a theoretical matter that resolution of any legal questions not controlled by prior precedent be submitted to a three-member BIA panel for review, and we would encourage the BIA to proceed in this fashion when possible. But to read the streamlining regulations contrary to their plain language and *require* such a step would greatly weaken their designed effect by encouraging BIA members to ignore the (e)(5) procedure altogether and send anything requiring elaboration to a three-member panel. It would only exacerbate the difficulties created by the BIA's already heavy caseload.

In any case, the use of the (e)(5) procedure tempers the fears we raised in *Georgis*: the BIA has indeed had "first crack" at interpreting its own rules in this case, and IJs addressing this issue in the future will have authoritative

precedent upon which to rely. We therefore affirm the BIA on this issue. Gutnik no longer qualifies as a refugee and is therefore ineligible to apply for a § 1159(c) waiver of inadmissability in conjunction with an adjustment of status.

The petition for review is GRANTED as to some aspects of Gutnik's appeal and DENIED as to others as discussed herein. The matter is REMANDED for further proceedings. Mr. Gutnik is awarded costs on his appeal.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*
