In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2393

ROOME I. JOSEPH,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

On Petition for Review of an Order of the
Board of Immigration Appeals.
No. A79-286-874

ARGUED FEBRUARY 24, 2009—DECIDED AUGUST 27, 2009

Before ROVNER, WOOD and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* This is the second time that
Roome Joseph has appealed a decision of the Board of
Immigration Appeals ("BIA") denying her motion to
reopen removal proceedings. The stakes are high for
Joseph, as in Pakistan she faces either a forced marriage
or the prospect of living as a single Christian woman
without familial support, a dangerous path in that country.

When we first saw this case, we granted Joseph's petition for review and remanded to the BIA because it failed to consider Joseph's argument that her parents' threat of a forced marriage in Pakistan constituted a changed circumstance that could warrant reopening her removal proceedings. *Joseph v. Gonzales*, 240 F. App'x 726, 728 (7th Cir. 2007).

On remand, the BIA denied Joseph's motion to reopen. In her new petition for review, Joseph claims that the BIA again failed to consider her arguments, misconstrued relevant legal standards, and misinterpreted 8 C.F.R. § 1003.2(c)(3)(ii), which creates the relevant exception for the filing of an untimely motion to reopen. Because the BIA (acting through a single member) erred in interpreting the governing regulation, we grant the petition for review and remand.

**I**

The background facts of this case are detailed in our earlier order, *Joseph*, 240 F. App'x at 726-27, but we summarize them here. Joseph is a 28-year-old woman who came to the United States from Pakistan with her parents (Indrias and Catherine Joseph) and two brothers (Rabbi and Ravi Joseph) in 1998. Her father went back to Pakistan in 1999, but the rest of the family remained in the United States, overstaying their visitor's visas. Catherine Joseph then applied for asylum in 2001 based on the persecution that Christians face in Pakistan, but her application and subsequent motions to reopen were eventually denied by the BIA. Joseph's mother and

two brothers returned to Pakistan in 2005, but Joseph stayed in the United States. Joseph's family have since fled from Pakistan, first to Sri Lanka and then to Nepal.

Joseph's relationship with her family is strained at best. Dating back to 2000, Joseph's younger brother Ravi verbally and physically abused her because of her adoption of American social norms for women and her eventual marriage in 2004 to an American, Darrin Affrunti. (Joseph has since divorced.) Ignoring the U.S. marriage, Joseph's father informed her that he had arranged for her to marry a Pakistani man. Joseph believes that if she refuses, her family would disown her, and she would be forced to live as a single Christian woman in Pakistan. To establish what this would mean for her, Joseph submitted evidence that Christian women in Pakistan who are abandoned by their families in this way often face a life of prostitution, violence, and death.

On June 26, 2006, Joseph filed her own motion to re-open. Ordinarily, such a motion "must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened." 8 C.F.R. § 1003.2(c)(2). Joseph admitted that her motion was untimely, but she believes that she can demonstrate "changed circumstances" that exempt her from the time requirements. 8 C.F.R. § 1003.2(c)(3)(ii). The BIA denied Joseph's motion, but we granted her petition for review and remanded to the BIA because it failed to consider her argument that her parents' threat of forced marriage constituted a changed circumstance in Pakistan. On remand, the BIA again

denied Joseph's motion to reopen, and Joseph again petitions this court for review.

## II

We must first address the jurisdictional arguments raised by the Government. This court has jurisdiction over Joseph's petition for review of a BIA discretionary decision under 8 U.S.C. § 1252(a)(1) only if Joseph raises constitutional issues or questions of law; it lacks jurisdiction as a result of 8 U.S.C. § 1252(a)(2)(B)(ii) if Joseph does not raise such issues. *Kucana v. Mukasey*, 533 F.3d 534, 538 (7th Cir. 2008), *cert. granted*, 129 S. Ct. 2075 (2009). (Prior to *Kucana*, we reviewed many of the BIA's discretionary decisions for an abuse of discretion.) Both sides agree that there are no constitutional issues in this case, but the parties disagree about the critical question whether Joseph has raised issues of law. In *Huang v. Mukasey*, 534 F.3d 618 (7th Cir. 2008), we outlined what constitutes a legal issue:

> [A]ll the court can decide is whether the Board committed an error of law. That will usually be a misinterpretation of a statute, regulation, or constitutional provision. But it could also be a misreading of the Board's own precedent, or the Board's use of the wrong legal standard, or simply a failure to exercise discretion or to consider factors acknowledged to be material to such an exercise.

*Id.* at 620 (citations omitted). Even if Joseph can assert an error of law, she faces one additional hurdle. The BIA's

decision relied on two grounds for the denial of Joseph's motion to reopen: "she has not shown changed circumstances in Pakistan or that her application has a likelihood of being granted, if proceedings are reopened." The second ground represents the BIA's conclusion that Joseph has not put forward a *prima facie* case that her asylum case would succeed. See *Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir. 2003). If there are two alternative grounds for denying relief, and we lack jurisdiction to review one, then we lack jurisdiction over the whole case. See *Ekasinta v. Gonzales*, 415 F.3d 1188, 1191 (10th Cir. 2005). Thus, Joseph must assert errors of law that infect both grounds on which the BIA relied in order for this court to retain jurisdiction.

We conclude that she has done so. First, she argues that the BIA did not exercise its discretion in examining her arguments. Second, Joseph contends that the BIA misconstrued both the governing standard of evidence (well-founded fear) and the applicable doctrine (internal relocation) that justified its decision. Third, she claims that the BIA misinterpreted the term "changed circumstances" in 8 C.F.R. § 1003.2(c)(3)(ii). These are all legal issues that structure the BIA's inquiry and thus affect both whether she has shown changed circumstances and whether she has presented a *prima facie* case. We have jurisdiction to review these alleged legal errors.

**III**

We originally remanded this case to the BIA because the Board abused its discretion by not adequately con-

sidering Joseph's arguments about changed circumstances, specifically the fact that Joseph's family had arranged a marriage for her in Pakistan. *Joseph*, 240 F. App'x at 728. Joseph contends that on remand the BIA did not exercise the discretion this court ordered it to. The BIA did, however, at least address Joseph's argument on remand, reasoning that conditions in Pakistan had not changed because "families have pressured their children to marry for a very long period of time." Without commenting on the soundness of this position, we accept that the BIA exercised its discretion in examining Joseph's argument. This issue is thus not a ground on which she may rely at this stage.

For her second argument, Joseph focuses on one sentence in the BIA's decision: "It is not clear that an educated Christian woman, who has lived in the United States, could not live independently in Pakistan on her own, if she chose to do so." Joseph finds two implicit legal errors in this sentence. First, she seizes on the word "clear," believing that the BIA was referring to the "clear and convincing" standard of proof, rather than the required "well-founded fear" standard. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423-24 (1987). Second, she believes that the BIA may have subtly been referencing the internal relocation doctrine, which holds that if an asylum applicant could reasonably relocate to another part of the country and avoid persecution, she does not have a well-founded fear. 8 C.F.R. §§ 208.13(b)(2)(ii), (b)(3); *Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008) (noting that relocation must be both possible and reasonable). Joseph asserts that the BIA's analysis was incom-

plete, as it did not consider whether relocation would be reasonable.

These critiques read too much into that one sentence. The BIA's use of the word "clear" is best read as a common (and overused) turn of phrase, rather than as a truncated reference to the wrong standard of proof. With regard to the internal relocation doctrine, the BIA's opinion does not even allude to it or to its elements; the more logical explanation is that the Board was merely finding that Joseph had not met her burden in establishing that she faced danger in returning to Pakistan, given her educational status. Thus, we find no legal error here either.

Finally, Joseph argues that the BIA misinterpreted the regulatory provisions governing her untimely motion to reopen. The regulatory language states that the time limits do not apply to a motion to reopen to

> apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing.

8 C.F.R. § 1003.2(c)(3)(ii). The single member of the BIA to whom Joseph's case was referred interpreted the regulation to cover only "a dramatic change in the political, religious or social situation" and to exclude so-called "personal circumstances." In so doing, the Board member relied on *Raza v. Gonzales*, 484 F.3d 125 (1st Cir. 2007), and *Mabasa v. Gonzales*, 455 F.3d 740 (7th Cir. 2006). He found

no evidence of dramatic change in Pakistan and, after finding that Joseph's fear of arranged marriage was something entirely personal to her, concluded that this was not a proper ground for relief.

The Government argues that this regulatory interpretation is entitled to *Chevron* deference. *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). *Chevron,* however, deals only with the question whether an agency acts within its authority when it formulates a policy and issues a regulation. *Id.* And no one is arguing that § 1003.2(c)(3)(ii) itself represents an impermissible exercise of the Attorney General's power. The question before us instead is what deference is appropriate for an interpretation of that regulation. To answer that question, we turn to *Auer v. Robbins,* 519 U.S. 452 (1997), in which the Court discussed how much deference is due to an agency's interpretation of its own regulations. See also *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council,* 129 S. Ct. 2458, 2468-70 (2009) (following *Auer*); *Gonzales v. Oregon,* 546 U.S. 243, 257 (2006) (holding that *Auer* deference is not due to a regulation that "does little more than restate the terms of the statute itself"). In *Auer,* the Court held that an agency's interpretation of its own regulation "is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation." 519 U.S. at 461 (internal quotation marks omitted). We note as well that deference to the Executive Branch is "especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate

questions of foreign relations." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation marks omitted).

Even when we are talking about interpretations of statutes, not everything that an agency produces is entitled to the strongest form of deference. See *U.S. Freightways Corp. v. Commissioner of Internal Revenue*, 270 F.3d 1137, 1141 (7th Cir. 2001) ("deference to agency positions is not an all-or-nothing proposition; more informal agency statements and positions receive a more flexible respect"). Accordingly, in *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Court drew a distinction between statements from an agency designed to carry "the force of law," and less formal actions. *Id.* at 226-27.

*Mead* dealt with ruling letters from agents of the U.S. Customs service on the topic of tariff classification. These letters may be issued by any of the 46 port-of-entry Customs Offices. They contain varying levels of reasoning and are binding only on the party involved in the transaction at issue and not third parties. Furthermore, they are not subject to notice and comment; they need only to be made available for public inspection (rather than published); and they are usually subject to modification without notice. *Id.* at 223. The Supreme Court found that Congress nowhere intended the ruling letters to have the force of law, and that Customs had notice-and-comment rulemaking power that it could use when it wanted to adopt the kind of policy that would be entitled to *Chevron* deference. Nevertheless, the Court vacated and remanded because the letters were entitled

to deference under *Skidmore v. Swift*, 323 U.S. 134, 140 (1944). See *Mead*, 533 U.S. at 234 ("*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires") (internal citation omitted). Thus, deference to a ruling letter is appropriate based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore,* 323 U.S. at 140.

Just as varying degrees of deference are appropriate for regulations or other forms of guidance issued by agencies, so too are different levels of deference appropriate for interpretations of regulations offered by agencies. When the agency speaks formally, *Auer* holds that the agency's interpretation is controlling unless it is plainly erroneous or inconsistent with the regulation. An off-the-cuff response to an interpretive question from the first person who answers the telephone would be quite a different matter. Here, we have a decision by a single Board member, which puts us in a middle ground between the two poles we have just described. Just like the ruling letters in *Mead*, it is unpublished and nonprecedential. By the BIA's own regulations, a single member lacks the power to create a binding precedent. See 8 C.F.R. § 1003.1(g) (noting the conditions, not present here, when a decision can serve as a precedent).

The Board uses three-member panels to provide precedential decisions on important issues, including the following:

> (i) The need to settle inconsistencies among the rulings of different immigration judges;
>
> (ii) The need to establish a precedent construing the meaning of laws, regulations, or procedures;
>
> (iii) The need to review a decision by an immigration judge or the Service that is not in conformity with the law or with applicable precedents;
>
> (iv) The need to resolve a case or controversy of major national import;
>
> (v) The need to review a clearly erroneous factual determination by an immigration judge; or
>
> (vi) The need to reverse the decision of an immigration judge or the Service, other than a reversal under § 1003.1(e)(5).

8 C.F.R. § 1003.1(e)(6). The Board takes advantage of the streamlined procedures found in 8 C.F.R. §§ 1003.1(e)(4), (e)(5) for routine cases that can be processed quickly. As the regulation explains, "[a]n order affirming without opinion, issued under authority of this provision, shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the immigration judge or the Service were harmless or nonmaterial."

8 C.F.R. § 1003.1(e)(4)(ii). Cases resolved with a brief order by the single member are similarly nonprecedential. See 8 C.F.R. §§ 1003.1(e)(5), (e)(6)(ii) (indicating the need for three-person panel if a precedent must be established).

We addressed one question about the degree of deference due to single-member decisions in *Gutnik v. Gonzales*, 469 F.3d 683 (7th Cir. 2006). There, we held that these decisions should receive *Chevron* deference if they provide some reasoning to which this court can defer. *Id.* at 690. Most of our sister circuits have been unwilling to go that far. See *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012-13 (9th Cir. 2006) (*Skidmore* deference only for single-member decisions); *Quinchia v. United States Att'y Gen.*, 537 F.3d 1312, 1314 (11th Cir. 2008) (holding that *Chevron* deference does not apply to "a non-precedential decision issued by a single member of the BIA that does not rely on existing BIA or federal court precedent"); *Rotimi v. Gonzales*, 473 F.3d 55, 57 (2d Cir. 2007) (holding that "[b]ecause there is no indication that the BIA's nonprecedential single-member decision was 'promul-gated' under [the BIA's] authority to 'make rules carrying the force of law,' we do not accord it *Chevron* deference") (citation omitted) (internal quotation marks omitted). Other circuits have identified the question but declined to rule on it. See *Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 850-51 (8th Cir. 2008); *Li Fang Lin v. Mukasey*, 517 F.3d 685, 695 (4th Cir. 2008); *Smriko v. Ashcroft*, 387 F.3d 279, 289 n.6 (3d Cir. 2004). We need not resolve that conflict here, however, because *Gutnik* was concerned with the conventional *Chevron* question about the BIA's interpretation of the Immigration and Nationality Act

("INA") itself. 469 F.3d at 689. As we have already noted, we are concerned with a different question: whether its interpretation of an uncontested regulation was sustainable.

With respect to that question, we turn back to *Auer.* For the case before us, the question under *Auer* is whether the individual BIA member has interpreted the regulation in a way that is inconsistent with its language or that is plainly erroneous. See *Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("deference is warranted only when the language of the regulation is ambiguous"); *Bahramizadeh v. United States INS*, 717 F.2d 1170, 1173 (7th Cir. 1983) ("An agency may not interpret its regulations in a manner so as to nullify the effective intent or wording of a regulation.").

The regulation on which Joseph's case turns requires "changed circumstances arising in the country of nationality." 8 C.F.R. § 1003.2(c)(3)(ii). Nowhere does it signal a narrower requirement, such as the "dramatic change" the single member of the Board decided to require.[1] The plain language of the regulation does not require the asylum applicant to point to some kind of upheaval, such as the ascension of Pervez Musharraf to power in 1999 or the assassination of Benazir Bhutto in December 2007, in order to show changed circumstances. The

---

[1] We express no opinion on the question whether, if the Board were to issue a regulation with the narrower language using its notice-and-comment procedures, such a regulation would be consistent with the INA.

only requirements are (1) that there be changed circum-
stances, (2) that the circumstances be material and
(3) that the evidence showing changed circumstances "was
not available and could not have been discovered or
presented at the previous hearing." *Id.* These last two
requirements of materiality and non-availability weed
out the possibility that applicants will bring frivolous
claims or will fail to be diligent in gathering relevant
information earlier in the process. We note as well that
neither of the court of appeals decisions on which the
Board member relied, *Raza* and *Mabasa*, adopted a "dra-
matic change" standard. *Raza* had nothing to say
on this point, and *Mabasa* held only that conditions in
Zimbabwe had not changed at all over the relevant
time. 455 F.3d at 744.

The plain language of the regulation also does not
restrict the concept of "changed circumstances" to some
kind of broad social or political change in the country,
such as a new governing party, as opposed to a more
personal or local change.[2] The BIA and the Government
rely on *Cheng Chen v. Gonzales*, 498 F.3d 758 (7th Cir.
2007), to support their contrary contention. But *Cheng
Chen* dealt with an entirely different issue: whether an
applicant can claim changed circumstances in the
country of deportation based on his own actions *in the*

---

[2] We similarly express no opinion on the question whether an
appropriate regulation from the Board could, consistently
with the statute, restrict the concept of changed circumstances
to those occurring more generally in the country of nationality.

*United States*. In that case, a Chinese man who had been deported to China did not leave the United States but instead married and fathered two children here. He then tried to use this as the basis for claiming changed circumstances in China, asserting that he would be subject to forcible sterilization for violating China's one-child policy were he to return.

This court rejected his argument because the changed circumstances did not arise in China but instead arose from his actions in the United States. It was irrelevant that his claim involved family affairs or "personal circumstances." But it is easy to imagine a different scenario under which the BIA would have been required to consider his argument. For example, suppose China had no limitation on the number of children one could have and Chen had fathered two children here in the United States. If, after he is ordered deported, China suddenly institutes a one-child policy and threatens forced sterilization for those who have not complied, no matter where in the world their children were born, circumstances in the country of nationality would indeed have changed. This is so even though the policy addresses a supposedly "personal" circumstance. The difference is that the change would have arisen in China, not in the United States.

The consideration animating the decision in *Cheng Chen* is that "[i]t makes no sense to allow an alien who manages to elude capture by the immigration authorities for years after he has been ordered to leave the country, and has exhausted all his legal remedies

against removal, to use this interval of unauthorized presence in the United States to manufacture a case for asylum." *Id.* at 760. This is a worthwhile concern, but it does not apply to Joseph. She has in no way manufactured her case for changed circumstances; she alleges instead that she either faces a would-be suitor who might abduct her and force her to marry in Pakistan, a hostile family that might return to Pakistan to abduct her and physically abuse her, or a country in which she faces severe harassment—possibly rising to the level of persecution to which the authorities would turn a blind eye—as a single Christian woman without familial support. None of these is a manufactured circumstance, and all arise in Pakistan.

* * *

The BIA committed legal error in adopting an overly narrow interpretation of 8 C.F.R. § 1003.2(c)(3)(ii) that runs counter to the plain language of the regulation. We therefore GRANT the petition for review and REMAND to the BIA so that it might consider all of Joseph's arguments about the changed circumstances she faces in Pakistan.