In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2986

NINO AROBELIDZE,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A095 592 580

ARGUED MAY 2, 2011—DECIDED JULY 27, 2011

Before POSNER, KANNE, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Nino Arobelidze and her
mother entered the United States on temporary visas in
1998. The two went on to apply for permanent residence.
While their applications were pending, Nino's mother
violated the terms of her temporary visa by continuing
to work in the United States after the visa had expired.
Both applications for residence were denied in light of
Nino's mother's oversight. After Nino's mother ob-

tained a new temporary visa and reapplied for permanent residence, Nino again applied for residence as well. The rub was that Nino turned twenty-one during the bureaucratic process. Based on Nino's change in age, the Department of Homeland Security concluded that Nino was no longer a derivative beneficiary of her mother and thus no longer eligible to apply for residence under the provision she invoked. When removal proceedings began, Nino claimed that the Child Status Protection Act (CSPA) operated to freeze her age as of the date of her mother's original visa classification petition, meaning that she was still a beneficiary of her mother as of her second application. Both the immigration judge and the Board of Immigration Appeals were unconvinced, the latter holding that the CSPA did not even apply to Nino in light of its effective date section. Nino now petitions for review of the Board's determination, claiming that its interpretation of the effective date section is incorrect. Because we agree with Nino that the Board's interpretation is unpersuasive, we grant the petition, vacate the Board's opinion, and remand the case for further proceedings.

## I. BACKGROUND

Nino came to the United States in 1998 at the age of fourteen. She arrived from Georgia with her mother, Dr. Rusodan Kotaria. Dr. Kotaria, a biomedical researcher, was granted a temporary visa permitting her to live and work in the United States for a brief period. As her dependant child, Nino was granted a temporary visa to accompany her.

Over the course of three years, Dr. Kotaria's star rose within the scientific community. In 2001, the Chicago Medical School filed a visa classification petition for Dr. Kotaria, labeling her an outstanding researcher. The Department of Homeland Security approved the petition in June 2002. The newly-approved petition allowed Dr. Kotaria to do two things: to convert her status so as to legally work in the United States until March 8, 2003, and to apply for permanent residence (an "adjustment of status"). As her dependant, Nino was permitted to convert her status so as to remain with her mother and—more importantly—was able to apply for permanent residence alongside her.

Nino and Dr. Kotaria applied for adjustment of status in August 2002. Both applications were still pending with the Department in March 2003, when Dr. Kotaria's temporary visa expired. Dr. Kotaria continued working beyond March 2003, in violation of her visa. In light of that error, the Department denied Dr. Kotaria's application for adjustment of status in December 2004. Nino's application was denied at the same time—as a derivative beneficiary, Nino could only obtain an adjustment if her mother's application succeeded.

Dr. Kotaria's problem was easily rectified; Nino's, as it would turn out, was not. Dr. Kotaria returned to Georgia, obtained a new temporary visa from the United States Embassy located there, and returned to the United States in mid-2005. She then applied for permanent residence, which was granted in March 2006.

Nino remained in the United States during her mother's sojourn to Georgia. Once her mother returned, Nino

filed a second application for adjustment of status. The problem was that, around the time that her first application was denied, Nino had turned twenty-one. Given her change in age, the Department denied her second application for adjustment of status, reasoning that she was no longer a derivative beneficiary of her mother as of her second application and thus could not obtain an adjustment through her.

Removal proceedings for Nino commenced on February 10, 2006. At the removal hearing, Nino contested the denial of her second adjustment-of-status application. She argued that the substantive part of the CSPA operated to freeze her age at the date of her mother's initial classification petition, meaning that she was still the derivative beneficiary of her mother as of her second application for adjustment of status. The immigration judge disagreed, ruling on policy grounds that the CSPA was meant to protect children who age out during the processing of their application. It was not, according to the immigration judge, meant to assist parties whose applications were denied on other grounds. The Board affirmed in a non-precedential opinion, agreeing with the reasoning of the immigration judge.

Nino brought her case to this court on a petition for review, claiming again that the plain language of the CSPA dictated that she was still a child for adjustment purposes. We referred the case to mediation, after which the parties filed a motion with the Board to reopen the case. The Board agreed to reopen, but permitted very limited briefing, foreclosing a reply brief from Nino. The

Board then issued another non-precedential opinion, again denying Nino's appeal. This time the Board relied on the effective date section of the CSPA, ruling that Nino did not qualify for any of the CSPA's benefits.

Nino again petitions this court for review.

## II. ANALYSIS

Nino's single claim in her petition for review is that the Board erred in its reading of the CSPA's effective date section. The government's response is two-fold: first, it claims that Nino did not exhaust her remedies before the Board; and second, it argues that the CSPA does not apply to Nino because she does not fall within the Act's effective date section.

### A. Administrative Exhaustion

We take up the alleged failure to exhaust first. The government points out that Nino made no argument regarding the effective date provision and thus did not exhaust her administrative remedies. Nino concedes as much. She faults the limited briefing schedule imposed on the parties by the Board when the case was reopened. That schedule, Nino complains, impeded her from replying to the government's eleventh-hour argument regarding the effective date provision, an issue that no one—not the Board, the government, or Nino—raised prior to the reopening.

As the government correctly observes, an immigration petitioner must exhaust all available administrative

remedies before seeking review in this court. 8 U.S.C. § 1252(d)(1). That obligation usually forecloses a petitioner from raising an issue in federal court that was not raised before the immigration tribunal. *Aguilar-Mejia v. Holder*, 616 F.3d 699, 704 (7th Cir. 2010). We say "usually" because there are a number of exceptions to this rule. First, and less relevant here, are the exceptions that flow from the fact that the general exhaustion requirement is not "a jurisdictional rule in the strict sense that the Supreme Court has emphasized we must follow." *Issaq v. Holder*, 617 F.3d 962, 968 (7th Cir. 2010). Because the rule is non-jurisdictional, it is subject to waiver, forfeiture, and other discretionary considerations. *Juarez v. Holder*, 599 F.3d 560, 564 n.3 (7th Cir. 2010); *Korsunskiy v. Gonzales*, 461 F.3d 847, 849 (7th Cir. 2006). Second, and more germane to this case, is the exception for issues that are not raised by the parties but instead addressed by the administrative agency itself. *MBH Commodity Advisors, Inc. v. Commodity Futures Trading Comm'n*, 250 F.3d 1052, 1060 n.3 (7th Cir. 2001); *Watson v. Henderson*, 222 F.3d 320, 322 (7th Cir. 2000). This latter exception recognizes that once the Board addresses an issue on its own, the issue is "exhausted to the extent it could be," even if it was not raised by the parties. *See Nazarova v. INS*, 171 F.3d 478, 489 (7th Cir. 1999) (Manion, J., dissenting).

Practical considerations undergird this second exception. The exhaustion requirement serves a number of goals: it gives the Board an opportunity to apply its specialized knowledge and experience to the matter, it provides the petitioner with the relief requested in the

first instance, and it provides us with reasoning to review. *See Padilla v. Gonzales*, 470 F.3d 1209, 1213 (7th Cir. 2006); *Gonzalez v. O'Connell*, 355 F.3d 1010, 1017-18 (7th Cir. 2004). When the Board addresses an issue on its own, all of these concerns are satisfied, and it therefore makes little sense to deem an issue not raised by the parties unreviewable.

The parties argue needlessly over whether we can set aside Nino's failure to bring up the effective date section, ignoring the fact that the Board exhausted the matter. In its most recent order, the Board departed from its prior reason for denying Nino's appeal. Rather than continue to rely on the policy of the CSPA, the Board ruled that Nino did not fall within the effective date section of the Act. In doing so, the Board applied its knowledge and expertise to the issue, analyzing the reach of the effective date section and providing us with reasoning to review. Exhaustion satisfied, we can proceed to Nino's claim.

## B. *The Effective Date Section of the CSPA*

Nino primarily argues that the Board's reading of the effective date section is at odds with the text, purpose, and legislative history of that section. For its part, the government responds that Nino clearly falls outside of the plain text of the effective date section. In the alternative, the government submits that, even if the text of the effective date section is ambiguous, the Board's interpretation of it was a reasonable one to which we should defer.

The CSPA's effective date section provides:

The amendments made by this Act shall take effect on the date of the enactment of this Act and shall apply to any alien who is a derivative beneficiary or any other beneficiary of—

(1) a petition for classification under section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) approved before such date but only if a final determination has not been made on the beneficiary's application for an immigrant visa or adjustment of status to lawful permanent residence pursuant to such approved petition;

(2) a petition for classification under section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) pending on or after such date; or

(3) an application pending before the Department of Justice or the Department of State on or after such date.

Child Status Protection Act of 2006, Pub. L. No. 107-208, § 8, 116 Stat. 930 (2006). The single member of the Board who heard the case viewed subsection (1) as imposing two requirements: a visa petition must have been approved prior to the CSPA's enactment, and there must not have been a final determination on a beneficiary's application at any time afterwards. Dr. Kotaria's petition was approved on June 27, 2002, almost a year before the

CSPA was enacted, so Nino cleared the first hurdle. But because Nino had a final determination on one application for adjustment of status, the Board concluded that she tripped over the second requirement. The Board determined that neither of the other subsections applied to Nino, and thus Nino was not covered under the CSPA.

We review issues of law—including challenges to the Board's interpretation of the Immigration and Nationality Act (INA)—*de novo*. *Kiorkis v. Holder*, 634 F.3d 924, 928 (7th Cir. 2011). Our analysis begins with the statute's language. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Where Congress's intent is clear from that language, it must be given effect—neither the agency nor this court may deviate from it. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Where the statute is ambiguous, however, we owe some deference to the interpretation advanced by the agency assigned to administer the statute. *White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004).

Each party begins by arguing that the text of the effective date section is unambiguous and militates in its favor. We disagree. The Board has already determined, in a previous opinion, that the language of subsection (1) is unclear, *see In re Avila-Perez*, 24 I. & N. Dec. 78, 83 (BIA 2007), and we are similarly perplexed by it. The "before such date" language might be reasonably understood as applying only to the text preceding it— a reading the Board adopted and the government argues for today. Under that reading, subsection (1) would

not apply to beneficiaries of petitions approved prior to the effective date if they had a final decision on an application at any time after that point—including any time after the statute was enacted. That reading is consistent with the text of subsection (1), but it infringes on the overall structure of the effective date section, whose other subsections expressly deal with conduct occurring after the CSPA's enactment. On the other hand, the "before such date" language could be rationally read to apply to the entirety of subsection (1)—a reading advanced by Nino. Under that reading, subsection (1) would cover all beneficiaries of petitions approved before the statute was enacted, removing from the CSPA's coverage only those beneficiaries who had a final adjudication on an application prior to the CSPA's enactment. That reading would better serve the overall structure of the effective date section, but it is not, on its face, a more natural reading of subsections (1)'s text. When, as here, "there are two plausible but different interpretations of statutory language, there is ambiguity." *Khan v. United States*, 548 F.3d 549, 556 (7th Cir. 2008).[1]

---

[1] The presence of an ambiguity here should hardly be a surprise to the government. The web site for the United States Citizenship and Immigration Services, the division of the Department of Homeland Security that oversees lawful immigration to the United States, provides an explanation for the CSPA's eligibility requirements. The site states that a party is covered under the CSPA if they are "the beneficiary of a pending or approved visa petition on or after August 6, 2002," they have

(continued...)

Anticipating this ambiguity, the government urges us to apply *Chevron* deference to the Board's non-precedential interpretation of the effective date section. If *Chevron* deference applied, it would require us to adopt the Board's interpretation of the statute unless its construction was unreasonable. *See Chevron*, 467 U.S. at 842-43, 845. We note, however, that *Chevron* deference is not triggered in all cases. "Even when we are talking about interpretations of statutes [like the INA], not everything that an agency produces is entitled to the strongest form of deference." *Joseph v. Holder*, 579 F.3d 827, 831 (7th Cir. 2009).

The Supreme Court clarified *Chevron*'s reach in *United States v. Mead Corp.*, 533 U.S. 218 (2001). In *Mead*, the Court was tasked with determining the level of deference

---

[1] (...continued)

not "had a final decision on an application for adjustment of status . . . before August 6, 2002," and they "'seek to acquire' permanent residence within 1 year of a visa becoming available." United States Citizenship and Immigration Services, *Child Status Protection Act*, http://www.uscis.gov/portal/site/uscis/ menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid= 1f0c0a5659083210VgnVCM100000082ca60aRCRD&vgnextchan nel=1f0c0a5659083210VgnVCM100000082ca60aRCRD (last visited July 20, 2011). The site goes on to remind parties that they may be eligible if they "had not received a final decision on an application for permanent residence . . . prior to August 6, 2002." *Id.* While statements on the USCIS's website are not dispositive, the fact that the USCIS read the statute in a way that is in tension with the government's reading suggests that the section is indeed ambiguous.

owed to letters issued by the United States Customs Service. The letters—which instructed parties on their tariff classifications—were binding only on the party at issue, were not subject to notice and comment, and could be modified largely without notice. *Id.* at 223. The Court held that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226-27. Because the letters did not have the force of law, *Chevron* deference did not apply. *Id.* at 231-32.

Our task, in light of *Mead*, is to determine what proclamations by the Board carry the force of law, as only those proclamations are entitled to *Chevron* deference. Decisions by a three-member panel of the Board obviously carry the force of law, as the Board's regulations make clear that those decisions have precedential value and are binding on the Board when it decides future cases. *See* 8 C.F.R. § 1003.1(e)(6); *Joseph*, 579 F.3d at 832. Similarly, non-precedential Board decisions that themselves rely on applicable Board precedent would also carry the force of law, as the non-precedential disposition is merely applying reasoning that already carries precedential weight. *See Lagunas-Salgado v. Holder*, 584 F.3d 707, 711 (7th Cir. 2009); *Ali v. Mukasey*, 521 F.3d 737, 739 (7th Cir. 2008).

The question remains whether non-precedential Board opinions that do not rely on binding Board precedent are deserving of *Chevron* deference. Relying on *Mead*, all

of our sister circuits to address the issue have con-
cluded these non-precedential opinions—which by the
Board's regulations do not carry the force of law—are not
analyzed under *Chevron*. *Rotimi v. Gonzales*, 473 F.3d 55, 57-
58 (2d Cir. 2007) (per curiam); *Garcia-Quintero v. Gonzales*,
455 F.3d 1006, 1013-14 (9th Cir. 2006); *Carpio v. Holder*,
592 F.3d 1091, 1097 (10th Cir. 2010); *Quinchia v. U.S. Att'y
Gen.*, 552 F.3d 1255, 1258 (11th Cir. 2008). Another
circuit dodged the question but gave us a peek at its
hand, a peek that similarly swings against *Chevron* defer-
ence for non-precedential opinions. *De Leon-Ochoa v.
Att'y Gen. of U.S.*, 622 F.3d 341, 350-51 (3d Cir. 2010). The
remaining circuits have ducked the question entirely.
*Vasquez v. Holder*, 635 F.3d 563, 567 n.6 (1st Cir.
2011); *Cervantes v. Holder*, 597 F.3d 229, 233 n.5 (4th
Cir. 2010); *Mushtaq v. Holder*, 583 F.3d 875, 877 (5th Cir.
2009); *Japarkulova v. Holder*, 615 F.3d 696, 700-01 (6th Cir.
2010); *Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 850-51
(8th Cir. 2008).

Out of all of the circuits to address the question, we are
the only one to go the other way. In *Gutnik*, we deter-
mined that these streamlined, non-precedential opinions
are given *Chevron* deference so long as the Board provides
us with some reasoning to review. *Gutnik v. Gonzales*, 469
F.3d 683, 690 (7th Cir. 2006). In doing so, we relied on the
Supreme Court's general statement in *Aguirre-Aguirre*
that "'[j]udicial deference to the Executive Branch is
especially appropriate in the immigration context.'" *Id.*
(*quoting INS v. Aguirre-Aguirre*, 526 U.S. 415, 416 (1999)).
But *Mead* came after *Aguirre-Aguirre*, and it made clear
that the *sine qua non* of *Chevron* deference is an agency

statement carrying the force of law. *Mead*, 533 U.S. at 226-27. It is for that reason that we have expressed doubts about *Gutnik*'s vitality. *See, e.g., Chen v. Holder*, 607 F.3d 511, 514 (7th Cir. 2010); *Ghani v. Holder*, 557 F.3d 836, 840 (7th Cir. 2009); *Joseph*, 579 F.3d at 833. Today we hold that non-precedential Board decisions that do not rely on binding Board precedent are not afforded *Chevron* deference. To the extent that *Gutnik* is inconsistent with this, it is overruled.[2]

Just because *Chevron* deference does not apply does not mean that we owe no deference to the Board's interpretation. *Skidmore* deference still applies to less formal statements by an agency, *see Mead*, 533 U.S. at 234-35, and non-precedential opinions by the Board certainly fall within that group, *see Carpio*, 592 F.3d at 1098. Under *Skidmore* deference, the Board's interpretation is " 'entitled to respect'—but only to the extent that [it has the] 'power to persuade.' " *Bailey v. Pregis Innovative Packaging, Inc.*, 600 F.3d 748, 751 (7th Cir. 2010) (*quoting Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)). To assess the persuasive power of the Board's decision, we examine "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

---

[2] This opinion has been circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(e). No judge favored a rehearing en banc on the question of overruling the relevant part of *Gutnik v. Gonzales*.

We cannot say that the Board's interpretation of subsection (1), which led it to hold that Nino fell outside of the CSPA's coverage, is persuasive. For one, the Board's consideration is far from thorough—its effective date analysis occupied all of a paragraph of thought. The Board made no effort to consider how its interpretation of subsection (1) harmonized (or failed to harmonize) with the other effective date subsections. Moreover, the Board did not address the legislative history of subsection (1) or the tension between the Board's reading and the fact that the CSPA was meant to be an ameliorative statute, applying to as many parties as practicable. These are proper inquiries that the Board ignored.

The Board's analysis also fails to address reasoning it employed in a prior, precedential opinion. In *Avila-Perez*, the Board was tasked with determining whether the CSPA applied to a petitioner who had been the derivative beneficiary of a petition for classification, but had not filed an application for adjustment of status before the statute was enacted. *In re Avila-Perez*, 24 I. & N. Dec. at 80. That question required the Board to explore subsection (1), a subsection it deemed ambiguous. In analyzing the effective date section's legislative history, the Board determined that subsection (1) was "intended to expand the coverage of the statute beyond those individuals whose visa petitions and applications were pending on the date of the CSPA to also protect those individuals whose visa petitions were approved before the effective date, but *only if their applications had not already been finally adjudicated*." *Id.* at 85 (emphasis added). This observation clashes with the Board's conclusion here, and the Board made no effort to address the inconsistency.

The Board's opinion suffers from another, related problem: it ignores directly relevant legislative history. Because subsection (1) is ambiguous, its legislative history serves as a valid interpretive tool. *See Khan*, 548 F.3d at 556-57. That history recounts the purpose of what is now subsection (1), and it cuts against the Board's reasoning. Originally, the CSPA was to apply to all beneficiaries of visa petitions, whether the petitions were filed before or after the CSPA's enactment. *See Padash v. INS*, 358 F.3d 1161, 1171-72 (9th Cir. 2004) (recounting the history of subsection (1)). The Department of Justice expressed discomfort with such wide-reaching retroactivity. It noted that unlimited retroactivity would force it to reopen cases as old as 1952, imposing records problems and creating administrative backlog. H.R. Rep. No. 107-45, 6-7 (2001), *reprinted in* 2002 U.S.C.C.A.N. 640, 644, 2001 WL 406244. The end result was subsection (1), which was seemingly designed to solve the Department's concerns over reviving cases long disposed of. *See Padash*, 358 F.3d at 1172; *Avila-Perez*, 24 I. & N. Dec. at 85. Nino's reading of the subsection satisfies the Department's concern without removing a large segment of intended beneficiaries from the Act's coverage. The Board's reading, however, would go too far—there should be no records headache for matters still pending before the Department when the CSPA became effective.

It is for all of these reasons that we find the Board's reading of subsection (1) unpersuasive. More to the point, we are convinced that Nino's reading is correct: subsection (1) includes all beneficiaries of previously approved visa petitions except those with applications adjudicated prior to the CSPA's enactment. This reading

is more consistent with the legislative history of the CSPA, harmonizes with the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987), and meshes with the Board's earlier interpretation of subsection (1), *see Avila-Perez*, 24 I. & N. Dec. at 85. Finally, this reading satisfies the Department of Justice's concerns over administrative backlog. (We are confident that the Department will be thrilled that it got what it asked of Congress.)

Applying subsection (1), we conclude that the CSPA applies to Nino: her mother's classification petition was approved prior to the CSPA's enactment, and neither of Nino's adjustment applications were decided prior to the CSPA's enactment. Whether the CSPA will help Nino to attain permanent residency is another question, one that will depend on the actual text of the Act's substantive sections. That issue has not yet been fully addressed, and we accordingly leave it to the proper administrative body on remand.

### III. CONCLUSION

For the foregoing reasons, we GRANT the petition for review, VACATE the Board's decision, and REMAND the case for further proceedings consistent with this opinion.