In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3568

MIGUEL MACIAS MENDOZA,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III, Attorney
General of the United States,

*Respondent.*

On Petition for Review of a Final Removal Order of
the U.S. Department of Homeland Security.
A036 168 559.

ARGUED NOVEMBER 28, 2017 — DECIDED MAY 31, 2018

Before BAUER, ROVNER, and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge.* In 1995, Miguel Macias Mendoza
("Macias") reentered the United States after having been
removed only weeks earlier. When he came to the attention of
the government more than twenty years later, a deportation
officer for U.S. Immigration and Customs Enforcement ("ICE")

determined that Macias had illegally reentered the United States and was subject to reinstatement of the prior removal order. Macias raises a purely legal challenge to this conclusion, contending that, because his reentry was "procedurally regular," he was not subject to reinstatement but was instead entitled to a full hearing before an immigration judge. We deny the petition for review.

## I.

Macias, a native and citizen of Mexico, entered the United States with his family as a lawful permanent resident in 1976 at the age of six. In 1990, he was convicted in state court of attempted aggravated criminal sexual assault, aggravated battery, and burglary. While in prison for those crimes, he was also convicted of possession of a weapon by a felon. The Immigration and Naturalization Service ("INS") instituted removal proceedings against him while he was in prison, asserting that his convictions qualified as crimes involving moral turpitude, rendering him removable.[1]

In 1993, an Immigration Judge ordered Macias removed from the United States to Mexico. The order also prohibited Macias from returning to the United States for five years unless

---

[1] Congress transferred the functions of the former INS to the Department of Homeland Security ("DHS") on March 1, 2003. The transfer does not affect any legal issue in the case, and the DHS did not exist during any of the original administrative proceedings. *See United States v. Suarez*, 664 F.3d 655, 656 n.1 (7th Cir. 2011). We will use the current term, "removable" rather than the word "deportable," which was in use at the time of Macias's original proceedings. *See Guevara v. Gonzales*, 472 F.3d 972, 976 (7th Cir. 2007) ("deportable" is synonymous with "removable").

he obtained permission from the Attorney General. *See* 8 U.S.C. § 1182(a)(9)(A) (providing for a five-year period of inadmissibility unless the Attorney General has consented to the alien's reapplying for admission).[2] The Board of Immigration Appeals ("BIA") upheld the order, and in March 1995, Macias was removed to Mexico.

Macias did not remain there for long. The record contains no corroboration of when, how or where he crossed the border, but according to Macias, in April 1995, within weeks of his removal, he reentered the United States near Reynosa, Mexico. Macias returned to the United States purportedly to care for his young son who had been seriously injured in a car accident. Instead of seeking the consent of the Attorney General, he asserts that he approached a border inspection point in Texas prepared to offer his name and Social Security number. He claims that he encountered two border officers who waved him into the United States without questioning him or asking to see travel documents, instead greeting him with a friendly, "Welcome home." He returned to Chicago and remained there for twenty-one years. He made no attempt during that time to bring his immigration status into compliance with the law.

In July 2016, Macias was arrested and charged with aggravated driving under the influence of alcohol. While that

---

[2] At the time Macias was first removed in 1995, the statute then in effect required a previously removed alien to seek permission for readmission from the Attorney General. *See* 8 U.S.C. § 1182(a)(6)(B) (1995). The current version of the statute and the accompanying regulations are substantively identical to the law in effect in 1995. *See* 8 U.S.C. § 1182(a)(9)(A) (2013). We will refer to the current versions of the relevant statutes herein.

charge was pending, DHS served him with a Notice of Intent/Decision to Reinstate Prior Order of Removal. Citing 8 U.S.C. § 1231(a)(5) and 8 C.F.R. § 241.8 as authority, the Notice apprised Macias that DHS intended to reinstate the 1993 order that authorized his 1995 removal because Macias had illegally reentered the United States on an unknown date at an unknown place. The Notice provided that he could contest the determination that he illegally reentered and was subject to removal by reinstatement by providing an oral or written statement, but that he had no right to a hearing before an immigration judge. In a letter issued a few days later, ICE again invited Macias or his representative to make an oral or written statement in opposition to the contemplated reinstatement.

Macias opted for a written statement submitted by counsel. In the statement, counsel argued that Macias's reentry into the United States was lawful and thus did not meet the standard for reinstatement under section 1231(a)(5). In particular, Macias presented himself for inspection at a border checkpoint, did not deceive or attempt to deceive anyone, and was waved in by border guards. Counsel asserted that under the accompanying regulations and in light of *Matter of Quilantan*, 25 I & N Dec. 285 (BIA 2010), Macias's "procedurally regular" entry was lawful. Counsel noted that the Seventh Circuit had yet to rule on whether a procedurally regular entry could constitute an unlawful one for purposes of reinstatement, but conceded that other circuits had concluded that procedurally regular but substantively unlawful entries were unlawful for reinstatement purposes. Those cases were distinguishable, counsel asserted, because in each case the alien had engaged in some form of

fraud during the reentry process. Counsel also asked that ICE exercise prosecutorial discretion to allow Macias to remain in the country, asserting that he is "not an enforcement priority given the compelling and exceptional factors in his case, and his eligibility for other relief." Administrative Record at 63.

An ICE deportation officer then issued a decision rejecting Macias's arguments and reinstating the prior order of removal. The deportation officer found that *Quilantan* interpreted the word "admitted" as the term is used for adjustment of status, and in that context, the word denoted only procedural regularity. *See* 8 U.S.C. § 1255 (providing for adjustment of status of nonimmigrant to that of person admitted for permanent residence). Compliance with substantive legal requirements was not, therefore, required to be lawfully admitted for adjustment of status. But in the case of reentry after having been previously removed, the deportation officer concluded that substantive compliance was necessary to avoid "illegal reentry" under section 1231(a)(5). The deportation officer cited *Cordova-Soto v. Holder*, 659 F.3d 1029 (10th Cir. 2011), in support, noting that the factual circumstances were very similar, and that the Tenth Circuit had concluded that procedural regularity was not sufficient for lawful reentry. The deportation officer found that Macias had never sought the permission of the Attorney General to return, and thus his reentry was unlawful and the prior order of deportation would be reinstated. Finally, prosecutorial discretion was denied due to the serious nature of Macias's past crimes, his admitted membership in the Latin Kings, and the nature of his recent arrest for aggravated driving under the influence. Macias

petitions for review of the decision to reinstate the prior order of deportation.

## II.

We review *de novo* any questions of law regarding the interpretation of the Immigration and Nationality Act ("INA"). *Borrego v. Mukasey*, 539 F.3d 689, 691 (7th Cir. 2008). "If Congress has directly spoken to the precise question at issue, then a court must follow that clear guidance." *Cece v. Holder*, 733 F.3d 662, 669 (7th Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). But if a statute is silent or ambiguous, the court must defer to authoritative interpretations of the law by the applicable agency. *Cece*, 733 F.3d at 669; *Chevron*, 467 U.S. at 844. In the context of interpreting ambiguous provisions in the INA, this typically means "giving *Chevron* deference to the Board's reasonable interpretation set forth in precedential opinions interpreting the statute." *Cece*, 733 F.3d at 668.

The government primarily asserts that the statute is not ambiguous and that the plain language controls the outcome here. But the government also asserts that, in the absence of Board authority addressing the precise question at issue here, this court should defer to the statutory interpretation of the deportation officer who drafted the Notice of Reinstatement of Removal Order in this case. The government cites *Skidmore v. Swift*, 323 U.S. 134, 140 (1944), and *Bailey v. Pregis Innovative Packaging, Inc.*, 600 F.3d 748, 750–51 (7th Cir. 2010), in support. Those cases provide only that we may resort for guidance to agency opinion letters and interpretations by an agency administrator to the extent that those opinions have the

"power to persuade." *Skidmore*, 323 U.S. at 140; *Bailey*, 600 F.3d at 750–51. In determining whether such an opinion letter has the power to persuade, we typically examine "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements[.]" *Skidmore*, 323 U.S. at 140; *Arobelidze v. Holder*, 653 F.3d 513, 520 (7th Cir. 2011). Although we are sometimes willing to grant *Skidmore* deference to non-precedential decisions by single members of the Board of Immigration Appeals, the government has not cited and we have not been able to find any instance of providing *Skidmore* deference to a thinly-reasoned decision by a single deportation officer, and we decline to do so here. *Sanchez v. Holder*, 757 F.3d 712, 717 (7th Cir. 2014) (finding that a non-precedential decision by a single member of the Board is entitled to respect but only to the extent that it has the power to persuade); *Arobelidze*, 653 F.3d at 520 (same). And as will be apparent below, there is no need to resort to the interpretation offered by the deportation officer.

We begin with the statutory language:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

8 U.S.C. § 1231(a)(5). Macias does not dispute that he reentered after he was previously removed and that he did so during the five-year inadmissibility period without seeking the requisite consent from the Attorney General. The only point of dispute in interpreting the statute is whether Macias reentered "illegally."

That term is not defined in the statute, and so Macias contends that we should turn to the implementing regulation:

> (a) Applicability. An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances. In establishing whether an alien is subject to this section, the immigration officer shall determine the following:
>
> (1) Whether the alien has been subject to a prior order of removal. …
>
> (2) The identity of the alien, i.e., whether the alien is in fact an alien who was previously removed …
>
> (3) Whether the alien unlawfully reentered the United States. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or

> she was lawfully admitted, which shall include a
> check of Service data systems available to the officer.

8 C.F.R. § 241.8. Macias specifically cites the last sentence of subsection (a)(3) in support of his argument that a procedurally regular entry is not unlawful, focusing on the directive to determine whether the alien was "lawfully admitted."

In particular, Macias contends that the words "admitted" and "admission" have well-settled meanings in immigration law. Section 1101(a)(13)(A) of the Act provides:

> The terms "admission" and "admitted" mean, with
> respect to an alien, the lawful entry of the alien into
> the United States after inspection and authorization
> by an immigration officer.

Macias argues that Congress therefore expressly connected the concept of "admission" with "lawful entry." Macias presented himself for inspection and was authorized to enter by the two border guards who waved him into the country in 1995, he argues, and therefore his entry was lawful. And after all, he argues, there would be no need for an immigration officer to consider statements made by the alien or any evidence in the alien's possession (as provided in the regulation) if a simple check of DHS data systems could answer the question of lawfulness. But the regulation does not establish a definition for "illegal" reentry or a substantive standard for illegality in the reinstatement context. The regulation simply instructs DHS officials on how to go about collecting information needed to make the reinstatement determination. Nothing in the regulation renders the word "illegally" ambiguous. Moreover,

Macias goes a step too far in trying to equate "admitted" with *lawfully* admitted.

Macias turns to *Matter of Quilantan*, 25 I & N Dec. 285 (BIA 2010), in support. That case involved a citizen of Mexico who entered the United States without a visa. She approached the border as a passenger in a car, and although an immigration inspector asked the driver whether he was an American citizen, he did not ask Quilantan any questions. The inspector then waved the car through. Quilantan later married a U.S. citizen and applied for adjustment of status under 8 U.S.C. § 1255. That provision allows aliens who were "inspected and admitted or paroled into the United States" to apply for adjustment of status. DHS instead charged her with removability, and an Immigration Judge found that she was statutorily ineligible for adjustment because she had not been "admitted" to the United States within the meaning of section 1101(a)(13)(A) of the INA. The Immigration Judge concluded that a procedurally regular admission was insufficient to meet that standard.

Quilantan petitioned for review. The Board noted that, over the years, Congress had loosened the requirements for applicants for adjustment of status, dropping the requirement of lawful admission and maintenance of non-immigrant status, and eventually requiring only inspection and admission or parole into the United States. That meant that, as of 1980, "as long as an alien's entry into the United States as a nonimmigrant was procedurally proper (i.e., the alien underwent an inspection by an immigration officer, who subsequently admitted the alien), the alien could seek adjustment of status under" section 1255. *Quilantan*, 25 I & N Dec. at 289–90. The

Board was thus confronted only with the question of whether that interpretation remained valid after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). The Board held that, "by themselves, the terms 'admitted' and 'admission,' as defined in section 101(a)(13)(A) of the Act, continue to denote procedural regularity for purposes of adjustment of status, rather than compliance with substantive legal requirements." *Quilantan*, 25 I & N Dec. at 290. Because she presented herself for inspection, made no knowing false claims to citizenship, was asked no questions by immigration authorities and was allowed into the country, Quilantan was thus eligible for adjustment of status.

By its own terms, *Quilantan* defined "admission" and "admitted" only when used "by themselves" for "purposes of adjustment of status" under section 1255. 25 I & N Dec. at 290. Nothing in *Quilantan* renders the word "illegally" ambiguous in section 1231(a)(5), which applies not to adjustment of status but to reinstatement of removal orders for persons previously removed. By reentering the United States without the requisite permission after having been previously removed, Macias violated the predecessor version of section 1182(a)(9)(A). The government asserts that Macias thus reentered the United States illegally within the plain meaning of section 1231(a)(5). That is, his reentry was substantively illegal even if it was arguably procedurally regular. Even Macias concedes that, "[i]n common parlance, Macias's reentry might very well be described as 'illegal.'" Petitioner's Opening Brief at 2.

The government cites the Tenth Circuit's opinion in *Cordova-Soto* in support of its position that Macias's reentry without the required permission from the Attorney General

was illegal. Like Macias, Cordova-Soto lived in the United States as a lawful permanent resident when she was a child. She later committed two crimes involving moral turpitude. Like Macias, she was removed from the United States with a warning not to return for (in her case) ten years without obtaining special permission from the Attorney General. And like Macias, she returned anyway, without the requisite permission. She came through the border as one of three passengers in a taxi. The border inspector asked all of the passengers for identification. While Cordova-Soto "pretended to look for ID," the inspector moved onto other passengers, inspected the trunk, and then waved the car into the United States. 659 F.3d at 1030–31.

Cordova-Soto challenged the DHS determination that she was subject to reinstatement of the prior order of removal, claiming, in part, that her reentry was not illegal because it was procedurally regular. Like Macias, Cordova-Soto relied on *Quilantan*. The Tenth Circuit rejected Cordova-Soto's argument, noting that *Quilantan* interpreted the term "admitted" as it is used in section 1255(a), that the holding was limited to the terms "admitted" and "admission" when used by themselves, and that *Quilantan* focused on the long history of requiring only a procedurally regular entry for eligibility for adjustment of status. In contrast, Congress in section 1231(a)(5) did not use the term "admitted" by itself or otherwise. Congress:

> chose instead to hinge eligibility for reinstatement on illegal reentry, the plain meaning of which is a reentry in violation of the law. Nor do we believe that the BIA's unusual construction of "lawful entry" in the definition of "admitted" in

> § 1101(a)(13)(A)—which ignores the plain meaning
> of that term—reasonably extends beyond its use in
> that definition.

*Cordova-Soto*, 659 F.3d at 1034. The court thus distinguished "lawful entry" for purposes of determining whether an alien has been admitted under section 1255(a), from illegal *re*entry by a previously removed alien, which is at issue in section 1231(a)(5).

The court also noted that an alien who has previously been removed is subject to criminal penalties if she thereafter "enters, attempts to enter, or is at any time found in, the United States," unless the Attorney General has expressly consented in advance to her applying for readmission, or she establishes that she was not required to obtain the Attorney General's advance consent. *See* 8 U.S.C. § 1326(a). In short:

> We cannot conclude that a previously removed
> alien's procedurally regular entry could be, at the
> same time, a legal reentry for purposes of
> § 1231(a)(5), thereby precluding reinstatement of her
> removal order, yet also an illegal reentry subjecting
> her to criminal prosecution under § 1326(a).

*Cordova-Soto*, 659 F.3d at 1034.

We find the reasoning of our sister circuit persuasive and see no reason to depart from it. Although Congress has made it progressively easier for some aliens to apply for adjustment of status under section 1255, lawmakers have also chosen to make it easier under section 1231(a)(5) to reinstate prior removal orders against those who have illegally reentered the

United States after having previously been removed. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33–34 (2006) (describing the history of the reinstatement provisions); *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 494 (9th Cir. 2007) (noting that Congress' purpose behind IIRIRA was to enable the prompt admission of those who are entitled to be admitted, the prompt exclusion or removal of those who are not so entitled, and the clear distinction between these categories). The enactment of IIRIRA, effective April 1, 1997, has provided for the broadest use of reinstatement, applying to *all* illegal reentrants, and explicitly insulating removal orders from review, while also generally foreclosing discretionary relief from the terms of the reinstatement order. *Fernandez-Vargas*, 548 U.S. at 34–35.

Other circuits have also treated a reentry after removal and without the Attorney General's consent (during the time period that consent is required) as an illegal reentry for the purposes of reinstatement under section 1231(a)(5). *See e.g., Anderson v. Napolitano*, 611 F.3d 275, 278–79 (5th Cir. 2010) (previously removed alien who reentered under new, married name and received passport stamp but did not obtain necessary permission from Attorney General, reentered unlawfully and was subject to reinstatement); *Morales-Izquierdo*, 486 F.3d at 498 (previously removed alien who returned to the United States unnoticed without obtaining required permission from Attorney General illegally reentered for reinstatement purposes); *Cordova-Soto*, 659 F.3d at 1035 (collecting cases). In some of these cases, the alien either conceded that the reentry without the permission of the Attorney General was unlawful or the alien engaged in some act of deception during the

purportedly "procedurally regular" reentry. For example, as we noted above, Cordova-Soto pretended to search for identification as the border officer inspected the vehicle and its other occupants. Anderson entered under a new (and misleading even though legitimate) married name. These small deceptions are not relevant to the core analysis because it is not procedural regularity that is at issue; rather it is substantive illegality that subjected each person to reinstatement.

In fact, prior to deciding *Cordova-Soto*, the Tenth Circuit found a procedurally regular entry to be unlawful for reinstatement purposes, although the alien had not raised the issue of procedural regularity. *See Lorenzo v. Mukasey*, 508 F.3d 1278, 1280–83 (10th Cir. 2007) (alien who passed through an official point of entry in the back seat of a car, without immigration officials examining or questioning her documentation, entered unlawfully for reinstatement purposes). The Tenth Circuit acknowledged that Lorenzo had not raised the statutory argument regarding procedurally regular entry on which Cordova-Soto relied, but the court nonetheless favorably cited and relied on *Lorenzo* in concluding that Cordova-Soto's reentry was unlawful. *Cordova-Soto*, 659 F.3d at 1035.

In sum, the statute providing for reinstatement for aliens who have reentered "illegally" after previously having been removed is not ambiguous. A person who reenters without the consent of the Attorney General during the required period violates at least two laws and therefore reenters illegally. *See* 8 U.S.C. § 1326(a) and 8 U.S.C. § 1182(a)(9)(A). Indeed, section 1326(a) subjects the violator to significant criminal penalties, and Congress could not have intended for such a reentry to be considered lawful merely because a border inspector mistak-

enly waved the violator into the country. Nothing in the accompanying regulation is contrary to that plain-language interpretation. Finally, we see no reason to depart from the Tenth Circuit's well-reasoned decision.

PETITION DENIED.